**WEDGES/LEDGES OF CALIFORNIA, INC. a California corporation, et al., Plaintiffs–Appellants,**

v.

**CITY OF PHOENIX, ARIZONA, a municipality, et al., Defendants–Appellees.**

**No. 92–15847.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 1, 1993.

Decided May 24, 1994.

---

Stephen P. Berzon, Michael Rubin, Jeffrey B. Demain, Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, CA, and Herbert Warren Kalish, Phoenix, AZ, for plaintiffs-appellants.

David C. Lewis and William R. Jones, Jr., Georgia A. Staton, Jones, Skelton & Hochuli, Phoenix, AZ, for defendants-appellees.

Before: CHOY, D.W. NELSON, NORRIS, Circuit Judges.

D.W. NELSON, Circuit Judge:

Appellants are the manufacturer and former distributors and owners of an arcade "crane" amusement game called "The Challenger." Soon after such games were first introduced in Phoenix, the City received numerous complaints about the games. The City responded by revoking license tags for some already approved machines and by imposing a blanket ban on new approvals for a period of roughly four and a half months. Appellants sued, claiming that the City's actions violated their equal protection, procedural due process and substantive due process rights, and seeking declaratory, injunctive, and monetary relief. The district court granted summary judgment for the City on the grounds that the equal protection claim was without merit and that Appellants did not have a protected liberty or property interest in continuing to operate already approved machines or in obtaining City approval to operate new machines. We affirm in part, reverse in part, and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1989, claimants P.A.L.L.S. Arizona, P.A.L.L.S. employee Lee Kellogg, Southwest Amusement, and Southwest Amusement president George Barker (collectively, "the Challenger operators" or "the game operators"), together with Wedges/Ledges of California, the manufacturer and distributor of the Challenger game, initiated a lawsuit under 42 U.S.C. § 1983 against the City of Phoenix, the Phoenix License Appeal Board, and members of the License Appeal Board (collectively, "the City"). Wedges/Ledges and the game operators (collectively, "Appellants") claimed that, in the late fall of 1986, the City began revoking existing licenses for crane games and implemented a blanket ban against the issuance of new licenses. These actions, Appellants claim, violated their due process and equal protection rights.

The Challenger game, like other brands of "crane" games, is a 25–cent arcade game which consists of a cube-shaped machine with an upper half encased in glass through which the player sees a bed of inexpensive prizes such as stuffed animals or plastic toys. The player, by operating a "joystick" which controls a mechanical arm inside the cage, attempts to use the crane to grab a prize within a set time period.

In 1986 and 1987, the legality of crane games in Phoenix was governed by Arizona Revised Statutes ("A.R.S.") § 13–3302 and Phoenix City Code ("P.C.C." or "Code") § 7–28.[1] Under those provisions, all persons seeking to operate coin-operated amusement games in Phoenix were required to obtain an operator's license, and then to apply separately to the City for license tags for each game that they sought to operate. The Code provided that, upon receiving a license tag application, the City Treasurer "shall make a determination as to whether or not the game in question qualifies as a game of skill based upon an evaluation and recommendation of the machine by the Police Department and other relevant information." P.C.C. § 7–28(b)(3). The Code further instructed the City Treasurer to issue an identification tag for each machine approved as a game of skill. P.C.C. § 7–28(c)(1).

Although earlier versions of mechanical crane machines existed in Arizona in the

---

1. All references to the Phoenix City Code and to Arizona state law are to the laws as they existed during the relevant 1986–87 time period.

1950s,[2] the first modern crane game to be evaluated by the City for licensing appears to have been the "Big Choice" game, which was presented to the City for licensing in 1985 by an operator who is not a party to this suit. Although the Big Choice game initially was rejected by the City Treasurer as an unlawful game of chance, the Licensing Appeal Board, after conducting a hearing, approved the game in early September 1986. After this approval, Wedges/Ledges and P.A.L.L.S. presented a Challenger machine to the City for a determination of its legality. Phoenix Police Detective David Bauer, the Department's expert on crane games, concluded that the Challenger game contained more elements of skill than the Big Choice game. The Challenger subsequently was approved as a game of skill and the City Treasurer began issuing machine license tags for Challenger games. The Challenger operators received tags for 92 machines in the period between early September 1986 and mid-November 1986.

In those same months, however, the Police Department received numerous complaints that crane games were being operated illegally. After conducting an investigation, the City began license revocation proceedings against a number of the machines. The Challenger operators allege that, despite the earlier approvals, the City in effect launched a campaign to do away with crane games, and claim that Detective Bauer instigated the campaign based on his own personal dislike for the game. Based on the License Appeals Board's approval of the Big Choice machine, Bauer had devised a list of seven guidelines for determining whether the games, as operated, were legal. The operators allege that Bauer never informed them of the existence or content of the guidelines.[3] Based on the guidelines, the City initiated revocation pro-

ceedings against ten machines, including three owned by Challenger operators.

In the period between November 13, 1986 and March 31, 1987, the City also denied every one of the 49 crane game license applications that it received. Included among the denials were 15 applications by plaintiff Lee Kellogg, 12 of which concerned machines previously approved by the City. As the district court concluded, the City effectively implemented a "blanket ban" on the games during this four and a half month period.

The blanket ban ended in April 1987 when the Phoenix Deputy Attorney, Jimmy Hays, wrote a memorandum to the City Treasurer and Police Department informing them that the City Attorney's office was "not of the opinion that all crane machines are games of chance," and that, "consistent with this belief and because the City Code requires it, all coin-operated game machine license applications must be processed on an individual basis." Rubin Dec'l, Ex. M (CR 135). The Deputy Attorney emphasized that "all denials must be accompanied by an explanation that indicates that the machine was turned down due to an individual analysis and not a blanket policy." Id.

Before the district court, the Challenger operators and Wedges/Ledges challenged both the City's revocations of existing licenses and its blanket ban on new licenses, invoking procedural and substantive due process rights. Appellant Lee Kellogg also claimed that the City's acts violated her equal protection rights. Appellants alleged that they suffered "lost sales, lost profits, lost business opportunities and other economic harms" as a consequence of the City's acts. First Amended Complaint, ¶ 41 (CR 72).

Upon cross-motions for partial summary judgment, the district court ruled in favor of

---

2. We note that Phoenix has a long history of regulating crane-type games on the basis that they are more akin to games of chance than games of skill. See Boies v. Bartell, 82 Ariz. 217, 310 P.2d 834 (1957); Phoenix v. Winn, 70 Ariz. 316, 220 P.2d 222 (1950).

3. The seven guidelines were as follows: (1) the entire field must be playable at all times; (2) prizes are to be kept on hand at the location of each machine and added to the machine several

times a day to ensure the playing field remains full; (3) the plush is to be 'fluffed up' hourly as long as there are people playing the machine; (4) there is to be no device on the machine which could regulate the strength of the claw less than 6½ ounces; (5) no prize may weigh more than 5 ounces; (6) prizes must consist of stuffed animals, dolls or similar stuffed plush; and (7) time must be posted and never set less than 15 seconds. See Order of Mar. 27, 1992 at 5 (CR 172).

the City in three separate orders. *See* Order of Mar. 27, 1992 (CR 172); Order of Apr. 9, 1992 (CR 178); Order of Apr. 23, 1992 (CR 184). The district court found that Appellants had not shown either that they had a liberty or property interest in the crane game licenses, and that Lee Kellogg had not shown that she was treated differently from similarly situated individuals. Appellants timely appealed. This court has jurisdiction under 28 U.S.C. § 1291.

## ANALYSIS

### I. STANDING

Before the district court, the City contended that Wedges/Ledges lacked standing to bring this suit. The City claimed that, because Wedges/Ledges is the manufacturer of the Challenger game rather than an owner/operator, it never was, or could be, in the position of applying directly for game licenses under § 7–28, and, therefore, could not have been injured directly by the City's policies. The district court disagreed, finding that the City's ban on new licenses for crane games "directly impacted" on Wedges/Ledges.

■ We review the question of standing *de novo*. *Ellis v. City of LaMesa*, 990 F.2d 1518, 1523 (9th Cir.1993); *Hong Kong Supermarket v. Kizer*, 830 F.2d 1078, 1081 (9th Cir.1987); *see also Lujan v. Defenders of Wildlife*, —— U.S. ——, ——, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992) (describing the evidentiary burden on plaintiffs' responding to summary judgment motions predicated on lack of standing).

■ Standing has constitutional and prudential dimensions. The Article III limitations are "(1) a threatened or actual distinct and palpable injury to the plaintiff; (2) a fairly traceable causal connection between the injury and the defendant's challenged conduct; and (3) a substantial likelihood that the requested relief will redress or prevent the injury." *Hong Kong Supermarket*, 830 F.2d at 1082. The prudential limitations include a requirement that the plaintiff "assert his own rights, rather than rely on the rights or interests of a third party" and "allege an interest that is arguably within the zone of interests protected or regulated by the statute or constitutional guarantee in question." *Id.*

■ The City appears to base its standing challenge on the belief that Wedges/Ledges, as the manufacturer rather than an operator of the games, cannot claim to have suffered injury to itself as a result of the City's actions. This claim is without merit. Each of the plaintiffs, including Wedges/Ledges, claimed in the complaint to have suffered "lost sales, lost profits, lost business opportunities, and other economic harms" as a "proximate result" of the City's policies with respect to crane game licenses. Wedges/Ledges, no less than the other plaintiffs, is claiming that the City's policies were aimed at and, at least in part, succeeded in destroying the market for crane games in the Phoenix area.

■ It is well settled that a provider of goods or services has standing to challenge government regulations that directly affect its customers and restrict its market. *See, e.g., Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n. 6, 83 S.Ct. 631, 636 n. 6, 9 L.Ed.2d 584 (1963) (publisher has standing to challenge actions of state morals commission which requested its customers to cease distributing its books); *Kansas City S. Indus., Inc. v. ICC*, 902 F.2d 423, 428–30 (5th Cir. 1990) (finding that owner of railroad terminal had standing to challenge approval of merger between two railroads because it would deprive terminal owner of revenue); *Block v. Meese*, 793 F.2d 1303, 1309 (D.C.Cir.) (finding that film distributor had standing to challenge the government's classification of a film as propaganda because the action was likely to result in fewer numbers of buyers), *cert. denied*, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986); *McCoy–Elkhorn Coal Corp. v. EPA*, 622 F.2d 260, 263 (6th Cir. 1980) (finding that producer of low-sulfur coal had standing to challenge a regulation requiring use of high-sulfur coal because its implementation would constrict the market for low-sulfur coal). Accordingly, we agree with the district court that Wedges/Ledges has alleged an economic injury sufficient to meet the Article III standing requirements.

Although Wedges/Ledges meets the irreducible constitutional minimum, we must next consider whether any of the prudential limitations on standing are applicable. The City suggests that we should deny standing because Wedges/Ledges is not asserting its own due process rights but those of the Challenger operators who sought license tags or had their tags revoked. We first note that this argument does not apply to the claims premised on business goodwill and on the right to pursue an occupation—for these claims, Wedges/Ledges is asserting its own rights directly. With respect to all other claims, however, Wedges/Ledges indeed is seeking to assert the rights of the Challenger operators.

Although a plaintiff generally "cannot rest his claim to relief on the legal rights or interests of third parties," *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), the Supreme Court has recognized an exception where the plaintiff meets the following three criteria: first, the plaintiff must have a concrete interest in the outcome of the dispute; second, the plaintiff must have a close relationship with the party whose rights it is asserting; and third, "there must exist some hindrance to the third party's ability to protect his or her own interests," *Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411 (1991); *see also Wauchope v. United States Dep't of State,* 985 F.2d 1407, 1411 (9th Cir.1993).

Although there is no question that Wedges/Ledges meets the first two criteria, the very participation of the Challenger operators in this suit demonstrates that there is no hindrance to the Challenger operators' ability to protect their own interests. Accordingly, we hold that although Wedges/Ledges has standing to assert the claims premised on business goodwill and on the right to pursue an occupation, it lacks standing to assert the claims based solely on the property and liberty interests of the Challenger operators.

## II. DUE PROCESS CLAIMS

The district court granted summary judgment in favor of the City on all claims on the ground that the Challenger operators did not have a protected property or liberty interest in the game licenses. This court reviews *de novo* the district court's grant of summary judgment. *Jones v. Union Pacific R.R.,* 968 F.2d 937, 940 (9th Cir.1992). The evidence must be viewed in the light most favorable to the nonmoving party to determine whether there are any genuine issues of material fact for trial. *Id.*

A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution. *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); *Kraft v. Jacka,* 872 F.2d 862, 866 (9th Cir. 1989).

A protected property interest is present where an individual has a reasonable expectation of entitlement deriving from "existing rules or understandings that stem from an independent source such as state law." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. "A reasonable expectation of entitlement is determined largely by the language of the statute and the extent to which the entitlement is couched in mandatory terms." *Association of Orange Co. Deputy Sheriffs v. Gates,* 716 F.2d 733, 734 (9th Cir.1983), *cert. denied,* 466 U.S. 937, 104 S.Ct. 1909, 80 L.Ed.2d 458 (1984). Although procedural requirements ordinarily do not transform a unilateral expectation into a protected property interest, such an interest is created "if the procedural requirements are intended to be a 'significant substantive restriction' on . . . decision making." *Goodisman v. Lytle,* 724 F.2d 818, 820 (9th Cir.1984) (citations omitted).

On appeal, Appellants claim that the City's policies infringed the following constitutional interests: A) a property interest in obtaining new license tags; B) a property interest in retaining existing license tags; C) a property interest in business goodwill; and D) a liberty interest in pursuing their occupations. We discuss each of these asserted interests below.

### A. *New License Tags*

The Challenger operators claim that the provisions of the Phoenix City Code cre-

ated a property interest in new license tags. The provision of the Code governing licensing of amusement games provides in relevant part as follows:

A. Coin–Operated Game Machines—Skill Games.

Only coin machines which are approved by the City Treasurer as games of skill may be operated as an amusement within the City of Phoenix.

B. Approval of Coin–Operated Games as Skill Games.

. . . . .

3. The City Treasurer shall make a determination as to whether or not [a proffered machine] qualifies as a game of skill based upon an evaluation of the machine and recommendation by the police department and other relevant information. . . .

C. Issuance and Display of the Machine, Identification Tags to Approved Machines,
. . . .

1. Owners of coin-operated game machines approved by the City Treasurer as games of skill shall be issued identification tags by the City Treasurer for each game approved by the City Treasurer.

P.C.C. § 7–28. The City claims that these provisions do not significantly constrain the discretion of the City Treasurer and thus do not create a legitimate expectation of entitlement on the part of license applicants. In particular, the City argues that the provisions lack the "explicitly mandatory language" necessary to create an entitlement. We disagree.

Section 7–28(B)(3) expressly provides that "[t]he City Treasurer *shall* make a determination as to whether or not [each proffered coin-operated game] qualifies as a game· of skill." Once this determination is made in the affirmative, § 7–28(C)(1) provides that a game license tag "*shall* be issued." The use of the imperative in these provisions is sufficient to create an expectation in applicants that, as long as their machines qualify as games of skill, they have a right to obtain license tags. Although the Code directs the City Treasurer to consider all "relevant information" when making its determination, it does not allow the City Treasurer to rest its

decision on anything other than the "game of skill" determination; the Code does not provide any open-ended discretionary factors. Accordingly, the question of whether the Code creates a property interest in new licenses turns solely on whether the "game of skill" criterion serves as a significant substantive restriction on the City Treasurer's discretion.

The City argues that the game of skill determination requires the exercise of broad discretion, and the City cites to *Jacobson v. Hannifin*, 627 F.2d 177 (9th Cir.1980), in support of this proposition. The City's reliance on *Jacobson* is misplaced. *Jacobson* involved a Nevada gaming statute that expressly granted the licensing body "full and absolute power and authority" to deny license applications "for any reason deemed reasonable." *Id.* at 180. The wide discretion conferred by the Nevada statute contrasts sharply with the narrow "game of skill" criterion at the heart of the Phoenix licensing statute. The City Treasurer's determination, moreover, is constrained further by P.C.C. § 7–3, which defines the term "game of skill" as "any game, contest, or amusement of any description in which the designating element of the outcome ... is the judgment, skill, or adroitness of the participant in the contest and not chance." This definition, derived from the interpretation Arizona courts gave to the predecessor statute to A.R.S. § 13–3302, further constrains the game of skill determination through its implicit directive that even games containing elements of chance can qualify as games of skill as long as skill is the "designating element of the outcome."

Taken together, the provisions of the Phoenix City Code create an "articulable standard" sufficient to give rise to a legitimate claim of entitlement. *Parks v. Watson*, 716 F.2d 646, 657 (9th Cir.1983) (finding that criteria for vacating plotted city streets created a property interest notwithstanding the fact that one of the criteria broadly directed the decision-maker to consider "the public interest," and noting that "a determination as to whether the public interest will be prejudiced, while obviously giving a certain amount of play in the decisional process,

defines an articulable standard."); *cf. Allen v. City of Beverly Hills,* 911 F.2d 367, 371 (9th Cir.1990) (holding that a provision allowing the Beverly Hills City Council to abolish any position in the classified service when "necessary in the interests of economy or because the necessity for the position no longer exists" does not significantly constrain the City's discretion and thus does not create a property interest); *Kraft,* 872 F.2d at 867 (holding that a Nevada statute granting Gaming Control Board "full and absolute power and authority" to deny license applications "for any reason deemed reasonable by the Board" does not create a property interest).

Accordingly we hold that the district court erred when it ruled that the Challenger operators did not have a property right in obtaining new license tags. We remand for a determination of what procedural safeguards and remedies were made available to the Challenger operators under the Phoenix City Code and under state law, and whether these procedures were constitutionally adequate. *See e.g., Zinermon v. Burch,* 494 U.S. 113, 126, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990).

### B. *Existing License Tags*

■ Although the district court did not analyze separately the Challenger operators' asserted property interest in retaining existing game tags, it denied all of their claims, apparently concluding that the City Code gave the City Treasurer sufficient discretion over whether to revoke existing licenses to defeat any claim of entitlement on the part of existing license holders. Again, we disagree.

The Phoenix City Code provision governing licensing of amusement games provides in relevant part as follows: "A machine which has been approved and tagged by the City of Phoenix is tagged for the life of the machine *so long as the machine is not altered and the license fees remain paid.*" P.C.C. § 7–28(C)(6) (1986) (emphasis added). This language clearly serves as a substantive limitation on the discretion of the City Treasurer—it only allows the City Treasurer to intervene in the event that the tag holder

alters the machine or fails to pay the license fee.

Accordingly, we hold that the game operators also had a protectible property interest in retaining their existing license tags, and again remand for a determination of whether the procedures for redress made available by the City and State were constitutionally adequate.

### C. *Business Goodwill and the Right to Pursue an Occupation*

Appellants also claim that they have a property interest in the goodwill of their businesses and a liberty interest in pursuing their occupations that the City jeopardized through its actions. The City first contends that the court should refuse to entertain these claims on the ground that Appellants did not raise them before the district court.

■ Although "[o]ur general rule is that we will not consider issues raised for the first time on appeal," *United States v. Carlson,* 900 F.2d 1346, 1349 (9th Cir.1990), the rule is inapplicable here because Appellants specifically brought the claims to the attention of the district court. As an initial matter, we note that although Appellants did not assert the business goodwill and pursuit-of-occupation claims by name in their First Amended Complaint, the City does not and cannot argue that the claims were not within the scope of the complaint—Appellants alleged in their complaint not only that they had liberty and property interests in "obtaining and retaining" license tags, but also that they had liberty and property interests "in conducting their amusement game business in the city of Phoenix and the surrounding metropolitan area." First Amended Complaint, ¶ 52 (CR 72). In their briefs to the district court, moreover, Appellants repeatedly specified that the City's acts deprived them of "constitutionally protected property and liberty interests ... in pursuing their lawful occupations and in maintaining the goodwill of their businesses." Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment at 7 (CR 134); *see also* Plaintiffs' Response to Defendants' Motion for Summary Judgment at 1–3 (CR 180). Finally, Appellants reasonably contend

that the only reason they did not again specify the basis for their due process claims orally before the district court is that the court expressly indicated that it did not want to hear argument on the issue. Accordingly, we conclude that the goodwill and pursuit-of-occupation claims were not waived, and proceed to consider whether Appellants should be allowed to pursue either of the claims on remand.

### 1. Business goodwill

■ Appellants claim that the City's acts deprived them of a property interest in the goodwill of their businesses. We look to state law to determine if business goodwill is properly characterized as a property interest. *See, e.g., Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir.1989) (holding that where state law treats goodwill as property, "[business goodwill] is a property interest entitled to protection; the owner cannot be deprived of it without due process"). Because the issue of whether Arizona law treats business goodwill as property was not fully briefed on appeal, and because the district court never addressed the claim, we leave the goodwill claim for initial consideration by the district court on remand.

### 2. The right to pursue an occupation

■ Appellants claim that the City's acts violated their substantive due process right to engage in the occupation of their choice. In order to establish such a substantive due process claim, Appellants must show, first, that they are unable to pursue an occupation in the amusement game business,

and, second, that this inability is due to actions that substantively were "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *FDIC v. Henderson*, 940 F.2d 465, 474 (9th Cir.1991) (citing *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.2d 1398, 1407 (9th Cir. 1989), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990) (quoting *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926))).

■ As an initial matter, we note that the fact that the City temporarily banned one particular type of amusement game does not in itself establish that the City unduly interfered with either the game operators' or manufacturer's ability to pursue their livelihood in the amusement game industry.[4] *Cf. e.g., id.* (holding that a former bank president who alleged that he was wrongfully discharged as a result of the actions of a state banking official must show that the acts left him "unable to pursue [any comparable] job *in the banking industry*") (emphasis added); *Di Martini v. Ferrin*, 889 F.2d 922, 927 (9th Cir.1989) (looking to whether the allegedly wrongful acts of a government official prevented the plaintiff from finding employment *"in the gaming industry"*) (emphasis added), *amended* 906 F.2d 465 (1990), *cert. denied*, 501 U.S. 1204, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991). Even assuming *arguendo* that the City's acts prevented Appellants from pursuing their chosen occupations, however, the grant of summary judgment was proper because Appellants cannot show that the

**4.** Although the City contends that the manufacture and operation of amusement games are not occupations that warrant constitutional protection, it is well-recognized that the pursuit of an occupation or profession is a protected liberty interest that extends across a broad range of lawful occupations, *see Greene v. McElroy*, 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959) (aeronautical engineer); *Schware v. Board of Bar Examiners*, 353 U.S. 232, 238–39, 77 S.Ct. 752, 755–56, 1 L.Ed.2d 796 (1957) (law practice); *Benigni v. City of Hemet*, 879 F.2d 473, 478 (9th Cir.1988) (bar ownership), and we assume without deciding that the operation of skill-based amusement games is within this range, *cf. Chalmers v. City of Los Angeles*, 762 F.2d 753, 756–57 (9th Cir.1985) (holding that selling t-

shirts from a vending cart is an occupation protected under the Constitution). Moreover, corporations, as legal persons, also can assert a right to pursue an occupation. *See Physicians' Serv. Med. Group v. San Bernardino County*, 825 F.2d 1404, 1407 (9th Cir.1987) ("A corporation ... is a 'person' possessing Fourteenth Amendment due process rights.") (citing *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 778–80, 98 S.Ct. 1407, 1416–18, 55 L.Ed.2d 707 (1978); *Old Dominion Dairy Products Inc. v. Secretary of Defense*, 631 F.2d 953, 962 (D.C.Cir.1980) ("[A] corporation may contract and may engage in the common occupations of life, and should be afforded no lesser protections under the Constitution than an individual to engage in such pursuits.").

City's ban on new license tags was clearly arbitrary.

■ It is well-established that the procedural and substantive requirements of the due process clause are analytically distinct—a procedurally flawed policy can pass substantive muster, and, conversely, a procedurally flawless policy can be substantively unacceptable. *See, e.g., Blaylock v. Schwinden,* 862 F.2d 1352, 1355 (9th Cir.1988) ("Substantive due process refers to certain actions that the government may not engage in, no matter how many procedural safeguards it employs."). When reviewing the substance of legislation or governmental action that does not impinge on fundamental rights, moreover, we do not require that the government's action actually advance its stated purposes, but merely look to see whether the government *could* have had a legitimate reason for acting as it did. *See Kawaoka v. City of Arroyo Grande,* 17 F.3d 1227, 1233–34 (9th Cir.1994).

The district court here found it undisputed that, prior to the ban, the City had received complaints that crane games were being operated illegally. This factual finding was based on the sworn deposition testimony of Phoenix detective Davis, and Appellants have not introduced any evidence that would create a genuine issue of fact as to the accuracy of the testimony. As the district court emphasized, within a month of the initial implementation of the ban, the City determined that as many as sixty existing games might have been in violation of A.R.S. § 13–3302 and P.C.C. § 7–28. We believe that this evidence is sufficient to establish that, whatever the merits of Appellants' procedural challenges, the four and a half month ban was not clearly arbitrary and irrational. The complaints alone could have led a reasonable official to conclude that a temporary ban on new tags was necessary prior to licensing tens or hundreds of new machines in order to give City officials time to investigate whether existing machines were being maintained in accordance with the regulations.

### D. *Conclusion*

We affirm the district court's grant of summary judgment in favor of the City on the substantive due process claim, but we reverse the grant of summary judgment on the procedural due process claims. We hold that the Challenger operators had property rights in both existing and new license tags, and we direct the district court to consider on remand the claim of both the Challenger operators and Wedges/Ledges that they had a property right in business goodwill that was infringed by the City's acts.

### III. EQUAL PROTECTION

■ Appellant Lee Kellogg contends that the City violated her right to equal protection of the law when, pursuant to its blanket ban on new license tags, it denied her application for license tags for 15 Challenger machines. Kellogg notes that 12 of her machines, which she obtained from a prior owner-operator, previously had been approved by the City.[5] Her claim is that even though she and the former owner both were licensed to operate amusement games, and even though the City regulations governing license tags did not change in the intervening period, the former owner was awarded tags while she improperly was denied them. Kellogg claims that City officials knew that the blanket ban was contrary to law, and alleges that the ban was primarily the product of Detective Bauer's personal dislike for crane games. The City argues that because the ban applied across-the-board, Kellogg cannot show that she was treated any differently from similarly situated applicants. The City further argues that even if Kellogg states an equal protection claim, the grant of summary judgment should be upheld on the ground that the City had a rational basis for its disparate treatment of the pre- and post-ban applicants.

In granting summary judgment for the City on Kellogg's equal protection claim, the district court concluded that Kellogg had not met the threshold requirement of showing that the City's policies had a disparate impact on post-ban applicants. The district

---

**5.** Even though the former owner had obtained license tags for the machines, the Phoenix City

Code requires that machines be retagged upon transfer of ownership. *See* P.C.C. § 7–28(c)(9).

court noted that at the same time that the City imposed the blanket ban on new license tags, it also began to revoke existing tags, demonstrating that its policy was directed at all crane game operators equally. Although we believe that Kellogg's allegations *do* show that the City's policies had a disparate impact on post-ban applicants, we affirm the grant of summary judgment for the City on the equal protection claim on the ground that the City had a rational basis for its actions.

Although it is true that, as the district court observed, the City attempted to revoke some of the existing tags at the very time that it implemented the ban on new licenses, this circumstance alone does not suffice to show that individuals who applied for licenses after the blanket ban were treated the same as similarly situated applicants who applied for licenses prior to the blanket ban. Significantly, although the City denied *all* new license applications beginning in November 1986, it only initiated revocation proceedings against a handful of the over one hundred machines then in operation—most of those who applied for license tags prior to the ban continued to operate their machines after November 14 while those who applied after the ban had no opportunity even to begin operations. Accordingly, we conclude that the ban implicated equal protection concerns. *Cf. Del Monte Dunes v. City of Monterey,* 920 F.2d 1496, 1509 (9th Cir.1990) (noting that equal protection clause protects individuals from being singled out to bear the burden of governmental efforts at remedying perceived societal ills).

 "Unless a classification trammels fundamental personal rights or implicates a suspect classification, to meet constitutional challenge the law in question needs only some rational relation to a legitimate state interest." *Lockary v. Kayfetz,* 917 F.2d 1150, 1155 (9th Cir.1990). Although it is true, as Kellogg emphasizes, that even "the rational relation test will not sustain conduct by state officials that is malicious, irrational, or plainly arbitrary," *id.,* Kellogg cannot show that the City's blanket ban on new licenses was plainly arbitrary.

As described in the analysis of Appellants' substantive due process claim above, it is undisputed that the City had received numerous complaints concerning the crane games both prior to and immediately after it first stopped issuing new license tags. Even construing all disputed facts in the light most favorable to Kellogg, the existence of the complaints shows that the City officials had reason to believe that the crane machines were being operated as games of chance, and, on this basis, the City's decision to halt the issuance of new tags until it could investigate the already approved games cannot be said to have been plainly arbitrary.

The existence of the complaints thus distinguishes this case from the cases relied on by Kellogg. In *Lockary,* for example, a number of landowners sued a local utility district claiming, *inter alia,* that a moratorium on new water hookups violated their right to equal protection of the law. *Id.* Although a moratorium on water hook-ups can be analogized to a ban on new license tags, the *Lockary* plaintiffs introduced evidence suggesting that the utility's rationale for the moratorium, a purported water shortage, was entirely pretextual. Here, Kellogg has not established a triable issue of fact as to the authenticity and significance of the complaints.

Accordingly, we affirm the district court's dismissal of the equal protection claim.

## CONCLUSION

We affirm the district court's grant of summary judgment for the City on the substantive due process and equal protection claims, but we reverse the grant of summary judgment on the procedural due process claims. We hold that the Challenger operators had property rights in both existing and new license tags, and we direct the district court to consider on remand the claim of both the Challenger operators and Wedges/Ledges that they had a property right in business goodwill that was infringed by the City's acts.

The parties shall bear their own costs on this appeal.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.