Argued and submitted May 11, 1998, reversed in part and otherwise affirmed on appeal; affirmed on cross-appeal February 24, 1999

## LINCOLN LOAN COMPANY,
an Oregon corporation,
*Respondent - Cross-Appellant,*

*v.*

## The CITY OF PORTLAND,
*Appellant - Cross-Respondent,*

*and*

## Gretchen KAFOURY,
David Sweet and Mitchell McKee,
*Cross-Respondents.*

(9403-02151; CA A90943)

976 P2d 60

Jeffrey L. Rogers, City Attorney, argued the cause for appellant and cross-respondents. On the opening brief was Harry Auerbach, Deputy City Attorney. With him on the combined appellant's reply brief and cross-respondents' brief on cross-appeal was Harry Auerbach, Deputy City Attorney.

Jeffrey C. Bodie argued the cause for respondent - cross-appellant. With him on the brief were Michael C. Zusman and Grenley, Rotenberg, Evans, Bragg & Bodie, P.C.

Before De Muniz, Presiding Judge, and Deits, Chief Judge, and Haselton, Judge.

DE MUNIZ, P. J.

## DE MUNIZ, P. J.

Defendant City of Portland (City) appeals from a judgment entered on a jury verdict awarding plaintiff Lincoln Loan Company (Lincoln) $2,750,000 on its civil rights claim under 42 USC section 1983. Lincoln cross-appeals the directed verdict in favor of defendants Kafoury, Sweet, and McKee (individual defendants). We reverse on the appeal and affirm on the cross-appeal.

We view the facts in the light most favorable to Lincoln, in whose favor the jury found. *Brown v. J. C. Penney Co.,* 297 Or 695, 688 P2d 811 (1984). Portland City Charter section 2-105(a)(35) grants City the power to "regulate the condition, care, use and management of buildings and structures in the City" for the protection of lives and health. City has adopted a housing code that sets the legal minimum standards for the condition of all residential properties within its boundaries, including rentals and owner-occupied housing. Portland City Code 29.05.030 (PCC). In 1991, a citizen task force, the Citizens Advisory Committee on Quality Rental Housing (CAC), was formed, in part, to evaluate the basis of City's complaints for code violations. The members were appointed by defendant Kafoury and included defendant Sweet, a City staff member. Kafoury directed CAC to find a new source to fund inspection programs necessary to correct pervasive, city-wide rental housing code violations. CAC determined that the existing enforcement system was inadequate and that many of the code violations were related to properties owned by a fairly small number of repeat offenders. CAC recommended that City should pursue the repeat offenders and that City should establish and publicize a list of 12 repeat offenders whose properties would be inspected to clean up numerous violations. The program was intended to target those landlords and their rental properties; contract sellers were not discussed. However, the PCC does not limit code inspections to rental properties, and "owners" of property include sellers and buyers of property under contract as well as landlords.[1] As a result of the recommendations, City revised its code to impose a $50 fee on properties when owners fail to complete repairs within 30 days after

---

[1] "[O]wner" is defined as "[a]ny person, agent, firm or corporation having a legal or equitable interest in a property." PCC 29.10.020.

the property is cited for code violations. Unpaid fees become liens on the property, with priority over other liens.

The housing code is enforced by City's Bureau of Buildings. In late 1993, the Bureau implemented the proposed inspection program and assigned defendant McKee actively to inspect rental properties. McKee compiled a list of property owners, including them in the program if (1) the owner owned three or more properties; (2) there were two or more unresolved files with the Bureau; and (3) the owner showed a history of slow response to citations for code violations. The list came to be known as the "Dirty Dozen."[2] There was evidence that McKee was given minimal or no guidance for defining and applying the criteria but that he visually screened an owner's properties without issuing citations to verify current condition before undertaking inspections. In late 1993, City inspected the properties of four or five landlords that met the criteria. By December, 42 inspections had been completed and citations had been issued for several properties being sold on contract, as well as on rental properties.

In January 1994, Lincoln was included in the Dirty Dozen. It was the first large property owner selected for the list, and no other mortgagee or contract seller of numerous properties was in the Dirty Dozen. McKee was "not sure" whether he had decided to include Lincoln in the Dirty Dozen before he reviewed Lincoln's 12 open files, eight of which were for nonrentals. Lincoln, run by Steve Benson and Melinda Wilde,[3] had a decades-long history of disputes with City. In recent years, Lincoln has focused on selling "fixer upper" properties in "as is" condition to persons of limited means or who could not qualify for conventional home mortgage financing. Lincoln provided financing using land sale contracts. At the time of trial, Lincoln had 20 to 30 rental houses, 111 houses being sold on contract, and 67 properties on which it held mortgages.

---

[2] In response to the question whether a Dirty Dozen program was implemented, Kafoury testified, "We didn't call it that, but that was the generic name, I guess."

[3] Lincoln was formerly run by Harry Benson, who died in 1993. Benson and Wilde are his children.

Lincoln's customary practice with potential contract purchasers is to ask them about their ability to make the repairs that the properties require and to encourage them to walk through properties to assure that the purchasers have the ability to make the repairs. After inspection and a sale is agreed on, Lincoln prepares a form contract and typically includes a note that the houses have "known deficiencies." Some of the contracts do not warrant the structural soundness of the dwelling and others acknowledge violations of the PCC. Although buyers promise to make the needed repairs, they cannot always do so, and properties may be returned to Lincoln for resale, a process sometimes repeated several times on the same property. Lincoln failed to record land sale contracts about 60 percent of the time. In that instance, the buyer's name will not appear on the computer records.

McKee's visual inspection of the exteriors of the 12 Lincoln properties that were indicated as "open files" revealed violations in all cases. He then obtained a computer printout of houses owned by Lincoln and visually screened an additional 30 properties, "a lot" of which he determined were in need of repair. City then began to inspect all properties Lincoln owned, as defined by the PCC. A large number turned out to be properties that Lincoln was selling on contract rather than rentals. Benson told City that it was improper to inspect properties other than rentals and offered to document which Lincoln properties were rentals, contract sales or mortgages. City's response was that it "didn't care" and would inspect the properties if Lincoln had an interest in them. Sweet acknowledged that City extended the program from a landlord inspection to include inspection of contract properties because Lincoln was a "special case." McKee admitted to Wilde that "there was something else behind the scenes that was going on" and that he knew that some of the buyers would get hurt. City inspected Lincoln's properties for 15 months, longer than anyone else's properties. About 51 of Lincoln's more than 200 properties were issued citations for violations of the code and another 17 received nuisance violations for other code violations.

During the inspection, articles ran in *The Oregonian* and in the *Business Journal,* quoting from City sources and suggesting that Lincoln was defrauding its customers and

engaging in unlawful trade practices. City also reported Lincoln's failure to record its contracts to the Attorney General, who subsequently investigated Lincoln. City also held a meeting that was attended by representatives of the Attorney General's office, volunteer lawyers, and buyers. However, at the meeting, buyers turned on City representatives, expressing anger at the inspections and the refusal to allow them latitude to improve the homes that they had purchased from Lincoln.

It is undisputed that Lincoln's properties were in need of repair and maintenance and clearly violated the code. At trial, there was testimony from an investigator employed by the state Attorney General's office that half of the 36 Lincoln properties the investigator had chosen at random were in "deplorable" condition in 1994 with visibly rotting exteriors, missing siding and missing windows. Some were in such "absolutely horrible" condition that he did not approach the house at all. Benson admitted to a City employee that Lincoln kept ownership of its better properties and sold the remainder to avoid landlord maintenance obligations. However, at trial, several property owners testified that they were grateful for the opportunity Lincoln had given them to take a distressed property and make it a home with increased market value.

Lincoln brought this action against City, seeking declaratory and injunctive relief and damages on several theories: tort claims for interference with contractual relations, for defamation and for civil conspiracy; a federal civil rights claim under 42 USC section 1983 for violation of due process and equal protection rights under the Fourteenth Amendment; a claim for violation of the equal treatment guarantee in Article I, section 20, of the Oregon Constitution; an inverse condemnation claim and a claim seeking a declaration that Title 29 of the PCC is invalid and unconstitutional.[4] We consider only the constitutional claims in this appeal. In those,

---

[4] Lincoln's state law tort claims were asserted only against City. The jury found in favor of City on Lincoln's defamation claim and in favor of Lincoln on its intentional interference with contractual relations claim, awarding damages of $3,327.56. On Lincoln's declaratory judgment claim, the trial court entered judgment for City, upholding the constitutionality of City's housing code. It allowed City's motion for a directed verdict on Lincoln's takings claim.

as Lincoln states, its "central theme at trial was the impropriety of [City's] malice-inspired effort to drive [Lincoln], and [Lincoln alone], out of business."

The trial court directed a verdict in favor of the individual defendants on the section 1983 claims on the ground of qualified immunity and for City on Lincoln's procedural due process claim. The jury returned a verdict finding that City had violated Lincoln's substantive due process and equal protection rights. It awarded Lincoln $2,750,000 in general damages on its section 1983 claim. The Article I, section 20, claim was submitted to the court, which, in light of the jury's verdict, ruled in favor of Lincoln. City's motions for judgment notwithstanding the verdict and for a new trial were deemed denied 55 days after entry of judgment. ORCP 63; ORCP 64.

■ We turn first to City's assignments of error regarding Lincoln's substantive due process claim.[5] City assigns error to the court's denial of its motions for judgment on the pleadings and for a directed verdict on that claim. In reviewing a motion for judgment on the pleadings, we determine whether the pleadings, taken together, affirmatively show that plaintiff has no cause of action against the defendant. *Scott & Payne v. Potomac Ins. Co.*, 217 Or 323, 330, 341 P2d 1083 (1959). We review the denial of a motion for directed verdict in the light most favorable to Lincoln to determine if there was sufficient evidence to submit the claim to the jury. *Devaux v. Presby*, 136 Or App 456, 459, 902 P2d 593 (1995). Considering those assignments together, *see* ORAP 5.45(6), we hold that, assuming that Lincoln alleged interference with a protected interest, it did not prove a constitutional violation of that interest.

■■ Section 1983 is not a source of substantive rights but a method for vindication of federal rights elsewhere conferred. *Baker v. McCollan*, 443 US 137, 144 n 3, 99 S Ct 2689, 61 L Ed 2d 433 (1979). The first step in analyzing a section 1983 claim is to identify the specific constitutional right allegedly infringed. *Graham v. Connor*, 490 US 386, 394, 109

---

[5] We do not separately address City's assignments of error relating to the inclusion of general damages in the verdict on the constitutional claims or to the court's denial of a new trial on those claims. However, we do consider both City's arguments and Lincoln's responses on those assignments insofar as they relate to the substantive due process issue. *See* ORAP 5.45(6).

S Ct 1865, 104 L Ed 2d 443 (1989). City argues that Lincoln failed to identify an interest protected by the Due Process Clause. City argues, moreover, that, even if Lincoln asserted such an interest, it is an economic or property interest and that the deprivation of such an interest is not redressable unless the governmental action is arbitrary and unreasonable with no substantial relation to public health or safety. *Village of Euclid v. Ambler Realty Co.*, 272 US 365, 395, 47 S Ct 114, 71 L Ed 303 (1926). Thus, City contends, where, as here, the government has acted on the basis of circumstances that do, in fact, exist, the government's motive for its actions is irrelevant. *D.C.A. Development Corp. v. Ogden City Mun. Corp.*, 965 F2d 827, 829 (10th Cir 1992).[6]

Lincoln argues that it alleged a violation of its right to a livelihood and that deprivation of that right has been recognized as coming within due process protection. *See Schware v. Board of Bar Examiners*, 353 US 232, 238-39, 77 S Ct 752, 1 L Ed 2d 796 (1957) (Due Process Clause protects liberty or property interest in pursuing the common occupations or professions of life). Lincoln argues that that right extends here to Lincoln, a corporation. *See San Bernardino Physicians' Services Medical Corp, Inc. v. San Bernardino County*, 825 F2d 1404, 1407 (9th Cir 1987) (" 'A corporation * * * is a 'person' possessing Fourteenth Amendment due process rights.' " (citing *First National Bank v. Bellotti*, 435 US 765, 98 S Ct 1407, 55 L Ed 2d 707 (1978)). Moreover, Lincoln contends, such an interest is "fundamental," requiring strict scrutiny of any governmental interference. *See, e.g., Meyer v. Nebraska*, 262 US 390, 43 S Ct 625, 67 L Ed 1042 (1923) (liberty guaranteed by Due Process Clause denotes, *inter alia*, right to engage in any of the common occupations of life). Therefore, Lincoln argues, "relevant" case law shows that, to prove a substantive due process violation here, all it had to prove was governmental action with an improper motive,[7] and, once that showing is made, no amount of "after-the-fact rationalization" will justify the governmental action.

---

[6] Lincoln has raised several arguments that City failed to preserve its claims of error. On reviewing the record, we find the issues preserved.

[7] Lincoln presented evidence in support of its position that the City targeted it: (1) City disseminated disparaging information about Lincoln to the media and to Lincoln's customers during the course of the inspections; (2) City instigated the

■ Lincoln alleged that City acted "with the intent to cause economic damage to [Lincoln] * * * and, ultimately, to drive [Lincoln] out of business[.]" For purposes of this opinion, we assume, without deciding, that Lincoln sufficiently alleged a constitutional interference with the right to pursue a livelihood,[8] and that, at trial, Lincoln adduced evidence from which the jury could conclude that City acted with malice in listing Lincoln as one of the Dirty Dozen and in inspecting properties that were not rental properties.[9] Nevertheless, we reverse the judgment on the section 1983 claims because, as City argues, Lincoln failed to prove a constitutionally cognizable deprivation of its claimed right to pursue its livelihood. City argues particularly that

> "a desire to deprive would not, in the absence of an actual deprivation, be a constitutional violation. The Constitution protects against real deprivations of enumerated rights, not against 'bad thoughts.'
>
> "[E]motion, even if the emotion spills over into active dislike, does not generate a federal constitutional case unless

---

Attorney General's investigation of Lincoln; and (3) City orchestrated the meeting for Lincoln vendees in order to "undermine" the confidence of the purchasers.

[8] *But see Patel v. Penman*, 103 F3d 868 (9th Cir 1996), where the gravamen of plaintiffs' claim was that, in closing plaintiffs' motel because of code violations, the city had acted to drive the motel out of business. The court refused to allow the plaintiffs to bring their action as a substantive due process claim. In so holding, the court relied on the United States Supreme Court's holding in *Albright v. Oliver*, 510 US 266, 273-74, 114 S Ct 807, 127 L Ed 2d 114 (1994), that, where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that amendment and not the more generalized notion of substantive due process must be the guide for analyzing the plaintiff's claims. The *Patel* court concluded that the substantive due process claim was preempted by the Fifth Amendment's Takings Clause. City argues that Lincoln's claim here is also one for a taking. However, it is not entirely clear where—or if—that theory was presented to the trial court and, because we determine that Lincoln failed, as a matter of law, to prove a substantive due process claim, we do not address City's taking arguments.

[9] Lincoln takes the position that "relevant" case law shows that, once it proved that City acted with malice, any rational basis for City's actions became irrelevant. *See Begnini v. City of Hemet*, 879 F2d 473 (9th Cir 1988) (owner of bar alleged that police harassment caused him to sell his bar at a loss); *Parkway Garage, Inc. v. City of Philadelphia*, 5 F3d 685, 692 (3d Cir 1993) (substantive due process violation proven if government's actions were, in fact, motivated by bias, bad faith or improper motive). Because of our determination that Lincoln failed to proved a constitutional deprivation of its claimed right, we do not decide whether those cases support Lincoln's proposition that bad faith conduct alone can lead to government liability as opposed to showing that the government's purported rational basis was merely pretextual.

real and serious harm is the result. That never came close to being shown in this case. Plaintiff made no showing that it ever lost any business, let alone all of its business, because of anything the City did."

Lincoln does not argue that it proved that City's actions prevented it from pursuing its business, and, indeed, admits that City "had not really taken, in a concrete sense, any property from [Lincoln]." As we understand Lincoln's argument, it contends that it need not make that proof because once it showed that City acted with an improper motive, "it is axiomatic that grievous, if not irreparable, harm to the business's reputation will result." Lincoln's position is that City's "disparaging statements," its conduct and its "unlawful targeting of Lincoln" resulted in "intangible harm"[10] from a loss of reputation,[11] and that monetary damages could therefore be presumed as they are in defamation.

However, Lincoln's claim is not one for defamation[12] but for a violation of section 1983. The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty or property, without due process of law," and when the claim is for violation of the right to pursue a livelihood, at a minimum, the plaintiff must show an inability to pursue the

---

[10] Lincoln argues that the "intangible harm" included the "unlawful targeting of Lincoln" that directly related to the attorney general's investigation. Lincoln contends that evidence showing that buyers became concerned about working with Lincoln and, in one instance, purchasing property outside the city, also demonstrates "intangible harm."

[11] We do not understand Lincoln to be arguing that City violated a protected constitutional interest in its reputation, and, indeed, it could not make that claim. *See Noble v. Board of Parole*, 327 Or 485, 494, 964 P2d 990 (1998) ("*Paul v. Davis*, 424 US 693, 96 S Ct 1155, 47 L Ed 2d 405 (1976), and *Siegert v. Gilley*, 500 US 226, 288, 111 S Ct 1789, 114 L Ed 2d 277 (1991), have made it clear that, by themselves, reputational interests alone are not 'liberty' interests within the meaning of the Due Process Clause and do not merit due process protections."). As we understand Lincoln's argument, it is that City's action diminished Lincoln's reputation, thereby violating its right to pursue its livelihood.

[12] In Lincoln's defamation claim, it alleged that City's "statements" were defamatory by tending "to subject Lincoln to ridicule, contempt, and to diminish Lincoln's esteem, respect, business goodwill, confidence and ability to conduct its business and generally prejudiced Lincoln in its business affairs." The jury found for City on that defamation claim. Lincoln contends that that finding does not undermine the award on the constitutional claim because the "elements of the respective claims are different" and it is "inappropriate" to speculate on the jury's decision.

occupation or business. Deprivation of that right is not presumed.[13]

In *Federal Deposit Ins. Corp. v. Henderson*, 940 F2d 465, 474 (9th Cir 1991), a former bank president alleged a violation of his substantive due process right to pursue the occupation of his choice. The court noted that he must show, not just that he was unable to pursue his profession in a particular bank, but that he was unable to pursue a job in the banking profession. In *DiMartini v. Ferrin*, 889 F2d 992, 927 (9th Cir 1989), the court confirmed a summary judgment on the plaintiff's substantive due process claim of interference with right to pursue future employment when the plaintiff's complaint contained no specific allegation that he was blacklisted in the casino industry where he had worked or was otherwise blocked in pursuing the career of his choice and where there was no evidence that governmental action would have that effect on his future. In *Wedges/Ledges of California v. City of Phoenix, Ariz.*, 24 F3d 56 (9th Cir 1994), the plaintiffs were the manufacturer, distributors and former owners of an arcade amusement game. The City of Phoenix revoked the licenses for some approved machines and imposed a ban on new ones for about five months. The plaintiffs brought an action alleging, *inter alia*, a substantive due process violation of their right to pursue the occupation of their choice. 24 F3d at 65. The Ninth Circuit noted that, in addition to showing that the governmental action lacked a rational basis, the plaintiffs must establish that they were deprived of the right to pursue their business, *id.*, and that they failed to do so:

> "As an initial matter, we note that the fact that the City temporarily banned one particular type of amusement game does not in itself establish that the City *unduly interfered with either the game operators' or manufacturer's ability to pursue their livelihood in the amusement game industry*." *Id.* (emphasis added).

*See also Waddle v. Forney*, 108 F3d 889, 895 (8th Cir 1997) (in claim that includes injury to one's reputation, constitutional deprivation required to be shown is that the publication must

---

[13] Because we do not find that Lincoln made that minimum showing, we do not decide what Lincoln would have to establish to convert what appears to be a tort claim for defamation into a claim for a violation of substantive due process.

prevent one from obtaining future employment, not merely damage to one's reputation).

■ Although Lincoln points to disparaging comments made by defendant's employees that, it contends, had a "negative" impact,[14] it does not argue that the claimed negative impact prevented it—even temporarily—from pursuing its business.[15] Insofar as the evidence showed, Lincoln continued to rent and sell properties. Lincoln failed to prove that City's actions resulted in a constitutional deprivation. The trial court erred in denying City's motion for a directed verdict on Lincoln's substantive due process claim.

■ City also assigns error to the trial court's denial of its motion for a directed verdict or for a peremptory instruction on Lincoln's equal protection claim. City argues that, to prevail on its claim, Lincoln had to show that all persons similarly situated were not treated alike, *Cleburne v. Cleburne Living Center, Inc.*, 473 US 432, 439, 105 S Ct 3249, 87 L Ed 2d 313 (1985), and that Lincoln failed to do so. City argues that it is undisputed that Lincoln is a landlord, as were the other property owners included in the inspection program, and that Lincoln did not show evidence of similarly situated contract sellers—*i.e.*, those who met the criteria for the inspection program because they owned rentals, as well as sold on contract—whose properties were not inspected.

Although Lincoln acknowledges that equal protection claims require proof that a plaintiff was singled out among similarly situated entities, it again responds by asserting that equal protection claims "share the element of improper government motive" with substantive due process claims. Thus, it argues, its equal protection claim does not

---

[14] Lincoln points to buyers: the Covers, who felt it was necessary to explore alternative financing for their home; Schwartz who sought other financing; and Weirsch who signed an estoppel deed back to Lincoln that expressly recited that it was given as the result of an inspection and the inability to make required repairs within 30 days. Melinda Wilde testified that "at least 20 people" called in response to house sale advertisements but hung up when they learned that Lincoln was the seller and that that had never happened before City's media campaign against Lincoln.

[15] Indeed, there is evidence to the contrary. Lincoln's buyers testified that they "always kept faith with Lincoln Loan" and that Lincoln had been "straightforward in their dealings."

challenge being included in the landlord inspection but, rather, its being labeled a Dirty Dozen property owner and City's use of a rental inspection program against Lincoln's nonrentals. However, those objections do not show that plaintiff was treated differently from others similarly situated.[16] Lincoln points to no evidence that other contract owners were not included in the program,[17] and it failed to prove that the law was not being enforced against other property owners who had pervasive violations. The trial court erred in denying City's motion for a directed verdict or peremptory instruction on Lincoln's equal protection claim. *But see Hunter v. City of Eugene,* 309 Or 298, 303, 787 P2d 881 (1990) (Oregon's Bill of Rights provides no textual or historical basis for implying a right to damages for constitutional violations).

■■■ City also assigns error to the trial court's finding that it violated Article I, section 20, of the Oregon Constitution.[18] Lincoln framed its claim and analysis in terms that are identical to those advanced with respect to the federal equal protection claim. *But see Crocker and Crocker,* 157 Or App 651, 971 P2d 469 (1998); *Tanner v. OHSU,* 157 Or App 502, 971 P2d 435 (1998) (both describing proper analysis under state constitution). Given the fashion in which the parties here have presented the issue, and in light of the foregoing discussion, we conclude that the court erred in finding that City violated Article I, section 20, for the reasons discussed under Lincoln's equal protection claim.

From our disposition, it follows that Lincoln's request for an award of attorney fees pursuant to 42 USC section 1988(b) is denied. Also, because of our disposition, we need not separately address City's remaining assignments of error.

---

[16] In fact, there was evidence that City had cited violations under the program at several properties being sold on contract by another owner.

[17] Lincoln asks us to take "judicial notice" from county records that there are many other contract sellers of residential property in Portland. Even if we did, Lincoln does not explain how that shows disparate treatment towards Lincoln here.

[18] City argues that Lincoln's claim should have been brought by writ of review. ORS 34.040. However, Lincoln is not challenging the citations but its listing as one of the Dirty Dozen. Assuming that the decision to include it was a "quasi-judicial" one, Lincoln does not challenge the decision on any of the grounds set out in ORS 34.040(1)(a)-(e). *See Ettner v. City of Medford,* 155 Or App 435, 963 P2d 149, *rev den* 328 Or 40 (1998).

■ We turn to Lincoln's two cross-assignments of error, only the first of which requires discussion.[19] Lincoln argues that the trial court erred in dismissing its procedural due process claim arising from City's "improper designation of [Lincoln] as a Dirty Dozen target." Lincoln argues that "a procedural due process claim is established where one is subject to a designation by the government without notice and an opportunity to be heard, and the designation results in both an injury to reputation and a change in legal status." *Paul v. Davis*, 424 US 693, 96 S Ct 1155, 47 L Ed 2d 405 (1976). Lincoln contends that the only question before us is the change in Lincoln's legal status because, at the time the trial court granted the directed verdict against the procedural due process claim, it had rejected City's directed verdict motions on substantive due process. Therefore, Lincoln contends, injury to reputation was shown. Although Lincoln is incorrect that the only argument under this assignment that we may address is legal status, *see State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988), we limit our discussion to that argument because it is dispositive.

In *Paul*, the Supreme Court explained the nature of a change in legal status:

"[T]he governmental action taken in [*Wisconsin v. Constantineau*, 400 US 433, 91 S Ct 507, 27 L Ed 2d 515 (1971),] deprived the individual of a right previously held under state law—the right to purchase or obtain liquor in common with the rest of the citizenry. 'Posting' therefore, significantly altered his status as a matter of state law, and it was that alteration of legal status which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards." 424 US at 708-09.

Lincoln contends that the designation in the Dirty Dozen changed it from "one of many contract vendors and lenders whose properties were inspected if complaints were made to the only one against whom an invidious and proactive course of conduct with a vastly different impact was directed, to the detriment of its protected interests."

---

[19] By this assignment, Lincoln seeks reversal of the court's decision in the event that we reverse the court's judgment. ORAP 5.57(2)(b).

Lincoln's protest, however, does not explain how including it in the inspection program deprived it of a right it previously held under state law.[20] As City points out, although the listing changed the manner of code enforcement, it did not change City's right to enforce its housing maintenance code against any and all offending properties.[21] Lincoln did not identify a change in legal status requiring predesignation procedures. The trial court did not err in directing a verdict against the procedural due process claim.[22]

On cross-appeal, Lincoln assigns error to the trial court's allowing the motions of individual defendants dismissing the federal constitutional claims against them on the ground of qualified immunity. Lincoln's assignment is implicitly and adversely answered by our holding that Lincoln failed to prove the constitutional claims.

On appeal, judgment in favor of plaintiff reversed on claims under 42 USC section 1983 for violation of plaintiff's equal protection and substantive due process rights and claim under Article I, section 20, of the Oregon Constitution, and otherwise affirmed; affirmed on cross-appeal.

---

[20] Lincoln argues that it could no longer sell houses "as is." That argument misses the point. Selling a property "as is" is not the same as complying with minimum standards required for residential properties in the City of Portland.

[21] A procedure was in place whereby Lincoln could challenge a notice of violation before any assessment, fine or lien became final.

[22] The Oregon Supreme Court's recent opinion in *Noble* considered the process due the petitioner before he could be designated as a predatory sex offender. It concluded that the public label of belonging to a certain undesirable group, when the governmental agency "must by law gather and synthesize evidence outside the public record" in making the designation required predesignation procedures under the Due Process Clause. 327 Or at 495-96. Here, inclusion on the inspection list was not mandated by evidence gathered outside the public record. PCC sets out conditions that violate the code, and owners were selected for the list on the basis of having three or more properties, two or more unresolved files with the Bureau of Buildings, and a history of slow response to citations for code violations.