Cristobal LUMBRERAS, Freemont Forest Systems, Inc., an Oregon corporation; Joost Vanderhave and Green Villa Farms, L.L.C., an Oregon limited liability company, Plaintiff,

v.

Jack ROBERTS, Nedra Cunningham, Stan Wojtyla, Defendants.

Civil No. 02–1738–MO.

United States District Court, D. Oregon.

May 26, 2004.

James M. Brown, Enfield Brown Collins Knivila & Cook, Salem, OR, Robert L. Engle, Engle & Schmidtman, Woodburn, OR, for Plaintiff.

Phillip Matthew Bender, Salem, OR, for Defendant.

## OPINION and ORDER

MOSMAN, District Judge.

This civil-rights lawsuit arises out of defendants' participation as state agency officials in the suspension of a labor license. Plaintiffs assert Section 1983 claims based on defendants' alleged violations of the Due Process and Equal Protection Clauses. Plaintiffs also assert a common law claim for defendants' alleged interference with plaintiffs' economic relations. Defendants have moved for summary judgment. For the reasons discussed below the court GRANTS defendants' motion in full. (Doc. # 28).

## I. BACKGROUND

The facts, viewed in the light most favorable to the non-movant plaintiffs, are as follows. This lawsuit rests on allegations that the Oregon Bureau of Labor and Industries (BOLI) wrongfully issued orders in June 2002 refusing to renew a labor license held by plaintiffs Cris Lumbreras and Fremont Forest Systems, Inc.[1] Lumbreras is Fremont's sole owner and executive. Although the other two plaintiffs, Joost Vanderhave and Green Villa Farms, LLC, held no interest in the li-

---

1. Although Lumbreras and Fremont were co-licensees of the license at issue, for ease of reference, the court sometimes refers to the license as belonging to Fremont only.

cense at issue, they claim that BOLI's refusal to renew the license nevertheless supports their claims, since BOLI's refusal allegedly interrupted their labor agreement with Fremont and thereby caused them to lose a strawberry crop. The events underlying this dispute are discussed in detail below.

Lumbreras and Fremont first obtained a BOLI license in 1989 allowing Fremont to act as a farm and forest labor contractor. As a labor contractor, Fremont employs various workers for agricultural projects as well as for fighting wildfires in Oregon and other western states.

BOLI is the Oregon state agency charged with ensuring that labor contractors such as Lumbreras and Fremont comply with various employment laws. For example BOLI monitors contractors for wage and hour compliance and to ensure that contractor-employed firefighters are properly trained. Defendant Jack Roberts acted as BOLI's elected commissioner during all times relevant to this lawsuit. As commissioner Roberts was statutorily charged with investigating complaints lodged against labor contractors. See, e.g., ORS 658.420(1); ORS 658.435(2). As he was authorized to do, Roberts delegated investigative responsibilities to Christine Hammond, who is not a party to this lawsuit. Hammond acted as administrator for BOLI's wage-and-hour division. Hammond, in turn, delegated certain investigative responsibilities to defendant Nedra Cunningham, the supervisor for the wage-and-hour compliance unit. Defendant Stan Wojtyla worked as a compliance specialist under Cunningham's supervision. As a compliance specialist, Wojtyla performed much of the daily investigative efforts such as interviewing witnesses and obtaining necessary records from those under investigation.

The events giving rise to this lawsuit began in March 2002. On March 20, 2002,

a BOLI-licensed labor contractor, Scott Coleman, informed BOLI staff that he had heard Fremont had used untrained crews of firefighters to fight forest fires during the 2001 fire season. Coleman also informed defendant Cunningham that Fremont had used false names for its firefighters. Coleman indicated that his source was a Joe Avila who had supervised Fremont firefighters in 2000 and 2001.

Coleman's complaint was not the first time Lumbreras's conduct as a labor contractor had been the subject of BOLI complaints. In 1993 Lumbreras signed a consent decree admitting he had violated Oregon law by acting as a contractor without a license. He also admitted he had violated certain unemployment-tax laws. In 1997 BOLI again initiated administrative proceedings against Lumbreras and Fremont. This time, on February 6, 1998, Lumbreras signed a consent decree admitting numerous violations of Oregon labor laws and agreeing to pay $40,000 in civil penalties. The terms of the 1998 decree allowed BOLI to "at any time audit [Lumbreras and Fremont] for compliance with all farm/forest labor contracting laws." Aside from the 1993 and 1998 consent decrees Lumbreras had also been the subject of at least ten wage claims filed between 1996 and 2001.

With Lumbreras's history of prior violations of Oregon law in mind, BOLI responded to Coleman's complaint by initiating immediately an investigation. Pursuant to the responsibility delegated to her by administrator Hammond, Cunningham supervised the investigation while Wojtyla did most of the field work. As a first step in the investigation, on March 21, 2002, one day after receiving Coleman's complaint, Cunningham informed BOLI's licensing clerk to withhold renewal of Fremont's labor license until further notice. Fremont's li-

cense was set to expire on March 31, 2002. Commissioner Roberts testified it was within Cunningham's authority to decide whether renewal of a labor contractor's license should be delayed pending any investigation. Roberts further testified that BOLI did not have any policies or guidelines specifically defining Cunningham's decision-making authority, although Hammond had the authority to overrule any of Cunningham's decisions.

Although the license was not renewed before or on March 31, 2002, BOLI informed Lumbreras that Fremont could continue to operate under the expired license during the pendency of BOLI's investigation.

Wojtyla testified in his deposition that he spent "hours and hours" investigating Coleman's complaint to help BOLI determine whether Fremont's license should ultimately be renewed. As part of his efforts, Wojtyla obtained from plaintiffs, BOLI inventory, and other government agencies several boxes of payroll, training, and other records regarding Fremont. For instance, in April 2002, Wojtyla wrote letters to Lumbreras seeking training records and information regarding any wildfires he had helped fight.

From his study of the records he obtained, Wojtyla concluded that Lumbreras had in fact allowed untrained workers to fight fires. Wojtyla found that Fremont's payroll records showed payments to certain employees for fighting fires while its firefighting-training records did not list those employees.

Wojtyla also conducted witness interviews. Wojtyla, for instance, contacted Joe Avila, the source of Coleman's complaint. Avila, however, refused to discuss the matter with Wojtyla. Avila would not confirm or deny Coleman's allegations, but merely told Wojtyla to do his "own investigations."

On May 17, 2002 Wojtyla also spoke with Terry Dunn who had worked alongside Fremont firefighters in fighting wildfires in 2000. Dunn told Wojtyla that he suspected Lumbreras had falsified firefighter-certification cards, as he witnessed Lumbreras filling out such cards even though Lumbreras was not a certified trainer. Firefighters are required to have certification cards when working for governmentally licensed contractors. In Dunn's experience only certified firefighter trainers have the authority to obtain and fill out certification cards. In addition Dunn told Wojtyla that Fremont's firefighters appeared to have no idea what they were doing at fires, especially as compared to firefighters employed by the contractor for whom Dunn worked. He, therefore, concluded that Lumbreras's firefighters lacked proper training.[2]

As a result of Wojtyla's investigation, BOLI also learned that Lumbreras had deducted from workers' pay the cost of work boots which Oregon law required firefighter to have. BOLI concluded that such deductions violated Oregon law. In addition, during the course of the investigation, BOLI also obtained thirteen wage claims for Fremont workers. (BOLI later reprimanded Wojtyla, however, because some of the wage claims were not signed by the workers at issue but rather by their relatives.)

Throughout the investigation, Cunningham expressed her opinion that Lumbreras had a reputation for violence and

---

**2.** One of the untrained workers BOLI suspected of fighting fires, Lucino Pantaleon, admits in an affidavit filed in this court that he in fact did fight fires even though he had not received training. The affidavit, however, is dated November 2002; thus, it appears that BOLI did not have this specific testimony from Pantaleon before it issued the June orders refusing to renew Fremont's license.

dishonesty. Cunningham, for instance, recounted to BOLI staff rumors that Lumbreras had killed a man and assaulted, sometime in 1999, a BOLI employee with a handgun. She additionally informed BOLI staff she viewed Lumbreras as someone who habitually breaks labor laws. Cunningham also told Lumbreras's former attorney, Kim Hoyt, that, given Cunningham's past experience with Lumbreras, she questioned whatever he said. Cunningham additionally told Lumbreras's present attorney, Mr. Brown, that she considered Lumbreras to be a "bad actor," especially in light of her knowledge of his brother's and father's reputations in the contractor business. And in a May 8, 2002 conversation with a supervisor for the Small Business Administration (a government agency which helped Lumbreras find projects) Cunningham stated that Lumbreras was having difficulty finding an attorney because whenever an attorney "finds out the particulars" of Fremont's situation he or she does not want to be involved.[3]

In addition Cunningham also expressed her opinion to BOLI "case presenter" Peter McSwain that she believed Lumbreras was not truthful. Based on Cunningham's statements during the investigation, McSwain concluded that Cunningham consistently held the view Lumbreras should not be a licensed contractor.

As the investigation progressed, Lumbreras or his attorneys, either Kim Hoyt or James Brown, remained in contact with BOLI. Sometime in April 2002, for example, Cunningham informed Hoyt BOLI was investigating allegations that Fremont had employed untrained firefighters. Hoyt later contacted BOLI, also in April, to inform Cunningham that she had documents showing that workers had used false names without Lumbreras's knowledge in obtaining firefighter jobs, thus helping exonerate Fremont and Lumbreras. (There is no indication in the record, however, that BOLI ever obtained this documentation before it formally suspended Fremont's license.) Although Lumbreras had contact with Cunningham and Wojtyla during the investigation, Commissioner Roberts refused to accept Lumbreras's invitation for a meeting to discuss the allegations. Roberts sent a message to Lumbreras informing him that Lumbreras should allow the case to progress through the compliance division and that it would not be appropriate for the BOLI commissioner to discuss a pending case.

Finally, sometime in May or early June, when he felt there was enough evidence to proceed further, Wojtyla turned the matter over to BOLI case presenter McSwain. In determining whether Fremont's license should be suspended immediately, McSwain testified, he did not rely on Wojtyla's findings Lumbreras had violated various wage laws or on Cunningham's opinions regarding Lumbreras's reputation as a violent and dishonest contractor. Instead McSwain focused on the records Wojtyla had obtained because, in his view, the records presented the type of evidence he could persuasively present to an administrative law judge. Based on those records McSwain concluded there was sufficient evidence to bring a case before an administrative law judge. Specifically McSwain believed the records corroborated Coleman's and Dunn's allegations. Like Wojtyla, McSwain concluded that available training and agency records revealed discrepancies suggesting Fremont had fought fires with untrained workers. Using un-

---

3. This statement appears to have been based on Hoyt's withdrawal from representing Lumbreras. The record is undisputed, however, that Hoyt withdrew only because of a conflict of interest.

trained firefighters, in McSwain's view, posed serious public-safety issues. Moreover McSwain testified that Fremont's discrepant records gave rise to the risk that appropriate personnel might never know about firefighters who perished in the woods or who were in "need [of] some kind of care."[4] McSwain was especially concerned because the wildfire season was just underway and he feared Fremont might again use untrained firefighters. Indeed the record shows Fremont had firefighters in the field during BOLI's review. Based on the public-safety issues McSwain perceived, he recommended to administrator Hammond that BOLI immediately suspend Fremont's license.

According to the record, BOLI does not generally enter orders without a hearing. It does so, however, when it perceives a serious risk to the public health or safety. BOLI generally issues such orders no more than five times a year.

Hammond reviewed McSwain's recommendation regarding Fremont's license in light of the evidence and agreed with McSwain. Consistent with Wojtyla's, Cunningham's, and McSwain's conclusions, Hammond believed Coleman's and Dunn's allegations were corroborated.

Finally, on June 12, 2002, BOLI issued an order entitled "Refusal to Renew Farm/Forest Labor Contractor's License (No. 5246) and Notice of Intent to Assess Civil Penalties." The June 12 order notified Lumbreras that "effective immediately" he and Fremont could not operate as a farm or forest contractor. As the basis for the decision, the order first listed BOLI's findings that Fremont had employed untrained firefighters. The order also delineated numerous discrepancies in the firefighter records. Aside from the

firefighter-related allegations, the order also asserted various wage-related allegations, including that Fremont had induced employees to relinquish their right to receive a statement of all itemized deductions from their paychecks and had failed to file timely certified payroll records with BOLI. To further justify the suspension, the order listed as "aggravating factors" Lumbreras's prior wage-related violations.

All total, considering the number of specific employees involved, the order delineated 93 specific violations of Oregon law. Plaintiffs agree, however, that the "principal issue against Lumbreras was allowing untrained [workers] to fight fires." See Plaintiffs' Statement of Facts ¶ 44.

The order expressly informed Lumbreras and Fremont of their right to obtain a contested hearing governed by the provisions of the Oregon Administrative Procedures Act ("APA"). The order stated they had sixty days from receipt of the order in which to request a hearing.

The June 12 order nowhere expressly mentioned that the use of untrained firefighters posed serious public-safety issues. As a result plaintiffs' attorney James Brown contacted BOLI arguing that the June 12 order did not make the necessary findings to support an immediate suspension. In arguing that the June 12 order was invalid, Brown relied on ORS 183.430 which allows an agency to suspend or refuse to renew a license without a hearing only when "the agency finds a serious danger to the public health or safety." After discussing the matter with administrator Hammond, she agreed to withdraw the June 12 order. She informed Brown that Fremont could continue to conduct business until BOLI issued a new order.

---

**4.** Consistent with McSwain's conclusions, in an affidavit plaintiffs filed with this court, Joe Avila, a firefighter with over thirty years experience, emphasizes the dangers posed by us-ing untrained firefighters. See Avila Aff. ¶ 9 (stating that "[u]ntrained employees [fighting fires] can be dangerous").

Although BOLI withdrew the June 12 order, many of Fremont's workers caught wind of the uncertainty surrounding Fremont's license. Many of these workers then left Fremont to seek other employment. As a result, Fremont lacked enough personnel to finish certain work. Most pertinent to this case, Fremont was unable to finish a job harvesting strawberries which were owned by plaintiffs Joost Vanderhave and Green Villa Farms. Because the strawberry-harvesting season is no more than three weeks long, Vanderhave and Green Villa were unable to secure replacement workers and thus lost most of their crop. They base their claims upon this loss.

BOLI did not issue an amended order until June 17, 2002. Unlike the June 12 order, the June 17 order expressly states, "the agency hereby finds a serious danger to public health and/or safety such as justifies this Notice of Intent being effective immediately." Aside from this finding, the June 17 order is materially the same as the June 12 order.

One day later, on June 18, 2002, Lumbreras and Fremont filed a lawsuit in state court against Commissioner Roberts, seeking a temporary restraining order and an injunction preventing BOLI from refusing to renew the license. That day circuit court judge Richard Barber entered a temporary restraining order *ex parte*. The order restrained BOLI from "refusing to renew plaintiff's license."

In the wake of Judge Barber's order, Lumbreras's attorneys and Assistant Attorney General William Brickey, who represented BOLI, began negotiations in an attempt to resolve the dispute. On July 2, 2002, the parties reached an agreement whereby Lumbreras agreed to dismiss the state court lawsuit in exchange for BOLI's issuing an amended order which would not be effective until there was a contested hearing. BOLI scheduled a contested

hearing for October 1, 2002, which was later continued.

Eventually, however, BOLI dismissed all proceedings against Lumbreras and Fremont. After further review, Hammond and McSwain determined that BOLI might have difficulty presenting sufficient evidence to support all the allegations set forth in BOLI's orders. It appears that Lumbreras and his attorneys ultimately presented enough satisfactory documentation to justify dismissing the proceedings. On November 22, 2002, Hammond briefed defendant Roberts about the case. In what appears to be his only direct involvement in this dispute, Roberts made the final decision that BOLI would renew Lumbreras's labor license. On November 22, 2002, BOLI renewed the license.

Based on the foregoing events plaintiffs filed this lawsuit on December 23, 2002. Plaintiffs brought Section 1983 claims for money damages against defendants premised on alleged substantive and procedural due process violations. They also asserted a Section 1983 claim based on alleged violations of the Equal Protection Clause. Plaintiffs additionally asserted a state law claim for interference with economic relationship.

On February 23, 2004 defendants filed a motion to dismiss in part and for summary judgment. Defendants' motion rests on numerous grounds: (1) plaintiffs have failed to state Section 1983 claims because the claims are lodged against defendants in their "official capacity"; (2) the Eleventh Amendment bars this lawsuit; (3) plaintiffs Vanderhave and Green Villa lack standing to bring their claims; (4) plaintiffs do not have sufficient evidence to show that defendants violated the constitution under any of plaintiffs' proffered theories; (5) defendants in any event are entitled to absolute immunity; and (6) defendants at the very least are entitled to

qualified immunity as to the federal claims and discretionary immunity as to the state law claims. On May 14, 2004 the court heard arguments on defendants' motion.

## II. SECTION 1983 CLAIMS

All four plaintiffs bring Section 1983 claims based on three constitutional doctrines: equal protection, procedural due process, and substantive due process. The court considers below defendants' various arguments aimed at plaintiffs' Section 1983 claims.

### A. Standing of Vanderhave and Green Villa

The court first considers defendants' subject-matter jurisdiction argument, specifically, that plaintiffs Vanderhave and Green Villa lack standing to assert their constitutional claims.

██ Standing has both constitutional and prudential dimensions. A claimant must establish three elements to satisfy the "irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). First, the claimant must show that he or she faces an imminent risk of suffering a "concrete and particularized" injury or actually suffered such an injury. *Id.* Second, the claimant must establish a causal connection between the threatened or actual injury and the conduct upon which the claims are based. *Id.* Finally, the claimant must convince the court that it is " 'likely, as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Id.* at 561, 112 S.Ct. 2130 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).

██ Clearing the irreducible constitutional minimum, however, does not guarantee a ticket into court. A court may also deny standing because of prudential limita-tions on the doctrine of standing. *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 61 (9th Cir.1994). "The prudential limitations include a requirement that the plaintiff 'assert his own rights, rather than rely on the rights or interests of a third party.' " *Id.* (quoting *Hong Kong Supermarket v. Kizer*, 830 F.2d 1078, 1082 (9th Cir.1987)). The Ninth Circuit has followed this principle when considering constitutional claims. See, e.g., *Portman v. County of Santa Clara*, 995 F.2d 898, 902 (9th Cir.1993) (rejecting argument defense attorney had direct standing to raise his clients' Sixth Amendment rights on their behalf, because "a litigant may invoke only his or her 'own legal rights or interests, and cannot rest his [or her] claim to relief on the legal rights or interests of third parties' " (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975))); *Wedges/Ledges*, 24 F.3d at 62 (finding lack of standing where manufacturer sought to base its due-process claims on the city's revocation of other entities' licenses); cf. *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 787–88, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) (holding that nursing-home residents could not state due-process claims based on government's revoking their homes' certification, even though residents likely faced serious loss). There is, however, an exception to this general prudential limitation; a plaintiff may base his or her claims on a third party's rights when three conditions exist:

first, the plaintiff must have a concrete interest in the outcome of the dispute; second, the plaintiff must have a close relationship with the party whose rights it is asserting; and third, "there must exist some hindrance to the third party's ability to protect his or her own interests."

*Wedges/Ledges,* 24 F.3d at 62 (quoting *Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)).

■ The court concludes that plaintiffs Vanderhave and Green Villa satisfy the constitutional minimum for establishing standing. They claim an actual and direct harm, namely, a loss of profits from the loss of their strawberry crop, a loss allegedly resulting from BOLI's refusal to renew Fremont's license. Moreover a money judgment in their favor would redress their alleged loss.

■ Nevertheless the two plaintiffs lack standing under prudential limitations. Their equal-protection argument rests on allegations that BOLI's conduct in suspending the license at issue treated Fremont and Lumbreras differently from others similarly situated. Vanderhave and Green Villa do not anywhere allege that the BOLI defendants unequally treated Vanderhave and Green Villa in any way. Indeed the record does not even show that defendants were aware of the relationship between Vanderhave and Green Villa, on the one hand, and Fremont and Lumbreras, on the other.

Nor do Vanderhave and Green Villa assert their own due-process rights. Instead their due process claims rest on BOLI's alleged deprivation of Fremont and Lumbreras's license, not on any deprivation of their own constitutional interests. In fact, as defendants point out, the APA indicates that only the licensees (*i.e.,* Lumbreras and Fremont) could have demanded an administrative hearing regarding the license's status. See ORS 183.430. There simply is no basis for Green Villa and Vanderhave to claim a violation of their own due-process rights. Thus they are barred from bringing their constitutional claims by the principle that plaintiffs cannot rest their claims to relief "on the legal rights or interests of third parties." *Wedges/Ledges,* 24 F.3d at 62. And they

cannot invoke the exception to this general principle. Although they "have a concrete interest" in the case's outcome and arguably a "close relationship" with Lumbreras and Fremont, "the very participation of" Lumbreras and Fremont "in this suit demonstrates that there is no hindrance to [their] ability to protect their own interests." *Id.* (holding that manufacturer of gaming machines could not base due-process claims on the revocation of the operators' licenses to operate the machines). In sum plaintiffs Vanderhave and Green Villa lack standing to bring their Section 1983 claims.

**B. Capacity in which Defendants are Sued**

Defendants argue that plaintiffs' Section 1983 claims fail, as a matter of law, for the simple reason they have sued the state-official defendants in their official, rather than personal, capacities.

■ The capacity in which defendants are sued is crucial because Section 1983 allows only "persons" to bring constitutional claims. See 42 U.S.C. § 1983. The Supreme Court has held that government actors who are sued in their official capacities do not qualify as "persons" for purposes of Section 1983. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 70–71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Suits against state officials come within Section 1983's scope only when they are sued in their "personal capacities." See *id.*

■ In addition the Eleventh Amendment bars damages actions brought against state officials who are sued in their official capacities. See *Romano v. Bible,* 169 F.3d 1182, 1185 (9th Cir.1999). The Eleventh Amendment bars official-capacity suits against state officials because such suits are "in reality suits against the state itself." *Id.* Official-capacity suits seek to

recover damages from the state treasury for losses caused by state custom or policy. See *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). That is, official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citation omitted). "Personal-capacity suits, on the other hand, seek to impose *individual liability* upon a government officer for actions taken under color of state law." *Hafer*, 502 U.S. at 25, 112 S.Ct. 358 (emphasis added).

Determining whether a plaintiff has sued government officials in their personal or official capacities is not always easy. See *Graham*, 473 U.S. at 165, 105 S.Ct. 3099 (noting that the "distinction ... continues to confuse lawyers and confound lower courts"). The Ninth Circuit, however, has created a presumption in favor of personal-capacity suits: The court has "presumed that officials necessarily are sued in their personal capacity where those officials are named in a complaint, even if the complaint does not explicitly mention the capacity in which they are sued." *Romano*, 169 F.3d at 1186. Thus when officials are named personally in a complaint and the plaintiff seeks money damages, the court must presume that the plaintiff asserts a personal-capacity suit. See *Shoshone–Bannock Tribes v. Fish & Game Comm'n, Idaho*, 42 F.3d 1278, 1284 (9th Cir.1994). "Any other construction would be illogical where the complaint is silent as to capacity, since a claim for damages against state officials in their official capacities is plainly barred." *Id.*

In this case, defendants emphasize that plaintiffs' complaint expressly uses the language "official capacity." See, Complaint ¶ 5 ("At times material [defendants] have acted in [their] *official capacity* and under color of law with respect to

plaintiffs." (emphasis added)); see also *id.* ¶ 4 ("Defendants have respectively acted with regard to plaintiffs in the exercise of authority granted to [BOLI] ... and have represented the official policy of [BOLI].")). The court rejects defendants' overly technical reading of the complaint. Read in full, the complaint is abundantly clear in alleging loss caused by defendants' individual conduct and in seeking money damages. The complaint's use of "official capacity" language is best viewed as an attempt merely to emphasize that the defendants were acting under "color of law"—a necessary prerequisite for Section 1983 liability—or as a half-hearted attempt to state claims against defendants in *both* their official and personal capacities. In any event defendants' arguments are not sufficient to overcome the presumption in favor of personal-capacity suits. As a result the court concludes that the Eleventh Amendment does not bar plaintiffs' Section 1983 claims.

## C. Claims Against Defendant Roberts

Defendants further argue that, as a matter of law, plaintiffs do not state any claims against BOLI Commissioner Roberts, because there is no evidence he affirmatively participated in the alleged unconstitutional conduct. The court agrees.

"*Resondeat superior* or vicarious liability will not attach under § 1983." *Collins v. City of Harker Heights*, 503 U.S. 115, 123, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (citation omitted). Accordingly, to establish Section 1983 liability, the plaintiff must prove that the government official played "an affirmative part in the alleged deprivation of constitutional rights." *King v. Atiyeh*, 814 F.2d 565, 568 (9th Cir.1987); see also *Rise v. Oregon*, 59 F.3d 1556, 1563 (9th Cir.1995) ("It is well established that section 1983 does not impose liability upon

state officials for the acts of their subordinates...."). Under this basic principle, a plaintiff may hold a supervisor personally liable only if the plaintiff can prove either "(1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir.1989).

■ Plaintiffs do not set forth sufficient evidence to hold Roberts responsible for the alleged constitutional violations. The record shows that Roberts was not involved in either the underlying investigation or the issuance of the orders. Instead, as he had a right to do as the BOLI Commissioner, Roberts had delegated the relevant responsibilities to his subordinates, whose conduct cannot be a basis for holding him personally liable. Thus, unlike defendants Cunningham and Wojtyla, Roberts did not affirmatively participate in the "alleged deprivation of constitutional rights." *King*, 814 F.2d at 568. The only specific allegation of wrongful conduct regarding Roberts is that he failed to meet with Lumbreras. There is no evidence, however, that Roberts knew or even had reason to know about any wrongful conduct on the part of his subordinates. See *id.* at 568 (granting dismissal against officials because no allegations they *"knew of,"* or took part in, any constitutional deprivations" (emphasis added)). Roberts' alleged failure to intervene is not sufficient on this record to subject him to liability. Cf., e.g., *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir.1994) (discussing federal cases and concluding that a government official may be liable for failing to intervene only when the official had a reason to know about other officers' unconstitutional conduct). Indeed the record shows that Roberts' only direct exposure to the decisions affecting Fremont's license was when he approved the license's *renewal* in November 2002.

At most plaintiffs' allegations seek to state a claim against Roberts in his official capacity. But, as already indicated, any official-capacity claims against Roberts would be barred by the Eleventh Amendment. The court, therefore, concludes there are no material issues preventing summary judgment in Roberts' favor.

**D. Immunity**

■ Section 1983's general policy is to ensure that "any person who under color of state law subjected another to the deprivation of his constitutional rights" answers for the deprivation. *Butz v. Economou*, 438 U.S. 478, 502, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). The Supreme Court, however, has recognized that subjecting officials to personal damages liability might deter officials' willingness to execute their duties "with the decisiveness and the judgment required by the public good." *Scheuer v. Rhodes*, 416 U.S. 232, 240, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1972), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). As a compromise to these competing policies, it has long been the rule that for executive officials a qualified, rather than absolute, immunity "represents the norm." *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

■ Nevertheless executive officers are entitled to absolute immunity under certain circumstances. The Supreme Court, for instance, has cloaked judges and prosecutors with absolute immunity. See, e.g., *Imbler v. Pachtman*, 424 U.S. 409, 424–25, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). More pertinent to the case at bar, the Court also has extended absolute immunity to administrative-agency officials whose functions are prosecutorial or adjudicatory in nature. See *Butz*, 438 U.S. at 513–15, 98 S.Ct. 2894.

Defendants in this case argue that as agency officials they are absolutely immune from all of plaintiffs' claims. At the very least, defendants argue, they are entitled to qualified immunity. The "line between absolute immunity and qualified immunity often is not an easy one to perceive and structure." See *Cleavinger v. Saxner*, 474 U.S. 193, 206, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985). The court need not, however, attempt to ascertain such a line in this case. As discussed below, the court finds that defendants are entitled to qualified immunity and thus need not examine issues presented by defendants' absolute-immunity defense.

■■■■■ Qualified immunity demands a two-step inquiry: First the court must determine whether, construing the facts in the light most favorable to plaintiff, the facts show the officials' conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Second, assuming the plaintiff has proven there is a material issue as to whether a constitutional violation occurred, the court next must determine whether a reasonable officer could have believed the conduct at issue comported with the constitution. *Id.* at 201–02, 121 S.Ct. 2151; see also *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The "could have believed" inquiry is designed to protect "all but the plainly incompetent." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The qualified-immunity defense, therefore, leaves "ample room for mistaken judgments," *id.*, consistent with the recognition that it "is sometimes difficult for an officer to determine how the relevant legal doctrine [applies] to the factual situation the officer confronts." *Saucier*, 533 U.S. at 205, 121 S.Ct. 2151. Thus, in determining whether immunity is appropriate, the court must be careful to avoid relying on hindsight and, instead, focus on the situation as it appeared to the officer

at the time the decision was made. See *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (*per curiam*) ("Our cases establish that qualified immunity shields [officers] from suit for damages if a reasonable officer could have believed [the conduct at issue] to be lawful, in light of clearly established law and *the information the officers possessed.*" (emphasis added)).

Again, plaintiffs plead three constitutional theories: procedural due process, substantive due process, and equal protection. Treating each theory separately, the court now turns to whether defendants are entitled to qualified immunity.

### 1. Procedural Due Process

■■■■ To establish a due-process violation the plaintiff must first prove a deprivation of a constitutionally protected right. See *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). Assuming there was a deprivation, the next question for procedural due process purposes is what process was plaintiff's due. *Id.*; see also *Hufford v. McEnaney*, 249 F.3d 1142, 1150 (9th Cir. 2001) ("A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." (citation omitted)).

Consistently, the Supreme Court has held that " 'some kind of hearing is required at some time before a person is finally deprived of his property interests.' " *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 16, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 557–58, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' "

*Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (citation omitted). A court must bear in mind that due process, "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and. circumstances." *Id.* at 334, 96 S.Ct. 893 (citation omitted); see also *Memphis Light,* 436 U.S. at 14 n. 15 ("the prior decisions of this Court make clear that due process is flexible and calls for such procedural protections as the particular situation demands." (citation omitted)).

Although some kind of pre-deprivation hearing generally is required, in balancing the competing interests involved, the Supreme Court has given substantial deference to government actors who took prompt action with the public health or safety in mind. Indeed, the "Supreme Court has repeatedly held that summary governmental action taken in emergencies and designed to protect the public health, safety and general welfare does not violate due process." *Sinaloa Lake Owners Ass'n v. Tudor,* 882 F.2d 1398, 1406 (9th Cir. 1989) (citing cases), *overruled on other grounds by Armendariz v. Penman,* 75 F.3d 1311, 1324 (9th Cir.1996). Determining whether "emergency" circumstances exist often requires the exercise of judgment in the face of incomplete information. Courts, therefore, have given government actors "great leeway in [applying] summary procedures" available in the applicable regulatory or statutory scheme, "even in the absence of an emergency in the usual sense." *Id.* (citation omitted).

For example, in *Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 596, 70 S.Ct. 870, 94 L.Ed. 1088 (1950), the Supreme Court upheld a summary seizure of misbranded vitamins although there was "no claim that the [products were] harmful or dangerous to health." The officials acted under a statute allowing summary seizure whenever products were considered "dangerous to health" or "would be in a material respect misleading" to consumers. *Id.* at 595–96, 70 S.Ct. 870. The Court agreed that such seizure decisions often cause "irreparable damage to a business" and that "[d]iscretion of any official may be abused." *Id.* at 599, 70 S.Ct. 870. But, the Court reasoned, government actors may "for the protection of public health" summarily destroy property, as long as "there is at some stage an opportunity for a hearing" regarding the underlying issues. *Id.* Whether the "public damage" resulting from otherwise "harmless articles" justified summary deprivation was a proper "decision for Congress" to make. *Id.* at 600, 70 S.Ct. 870.

Similarly, the Court in *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 301–02, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), upheld a statute permitting an agency to suspend summarily mining operations whenever there exists an "imminent danger to the health and safety of the public." The Court held that it was proper to vest in agency officials the discretion to make such "public health" determinations, given that protection "of the health and safety of the public is a paramount governmental interest which justifies summary administrative action." *Id.* at 300, 101 S.Ct. 2352. In so holding the Court rejected the district court's conclusion that agency officials were not guided by sufficiently "objective criteria" in making emergency assessments. *Id.* at 301–02, 101 S.Ct. 2352. While recognizing that the "possibility of administrative error inheres in any regulatory program," including those "authorizing emergency administrative action prior to a hearing," the Court determined that the availability of adequate post-deprivation procedures cured any due-process concerns. *Id.* at 303, 101 S.Ct. 2352; see also *Federal Deposit Ins. Corp. v. Mallen,* 486 U.S. 230,

237–39, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988).

Despite the deference usually given to an agency acting in a perceived emergency, an agency's "power to declare an emergency and thus eliminate the constraints of the due process clause is not without bounds." *Sinaloa Lake,* 882 F.2d at 1406. "The rationale for permitting government officials to act summarily in emergency situations does not apply where the officials know no emergency exists, or where they act with reckless disregard of the actual circumstances." *Id.*

With these various due-process principles in mind, the court turns to the particular facts presented.

### a. Constitutional Violation

Plaintiffs contend that the agency's failure to provide at least notice and an opportunity to object to the June 12 order violated due process. They emphasize that BOLI regulations make clear the extraordinary nature of suspending a license without any notice or opportunity to object. See OAR 839–015–0525 (providing that even if BOLI finds a serious danger it must give the licensee notice of the emergency order and "opportunity to object prior to issuing the" order unless "the danger to the public health or safety is so imminent that opportunity for the licensee to object ... is not practicable as determined by" BOLI). Plaintiffs further suggest that notice and opportunity to object were crucial in this case because of the allegedly overbroad nature of the June 12 order: The order listed ninety-three separate charges; thus, to continue in business, Lumbreras and Fremont argue that they were not just faced with meeting the untrained-firefighter allegations. In addition, plaintiffs argue, BOLI could have allowed the license to remain in effect for farm-related work, *i.e.,* non-wildfire work.

Given these circumstances, if plaintiffs were in this court seeking injunctive relief, the court might be inclined to require BOLI to give the licensee notice and an opportunity to object. Plaintiffs, however, are in this court seeking money damages, not temporary injunctive relief, therefore making available the defense of qualified immunity. Accordingly the court need not determinatively resolve the issue of whether plaintiffs have shown material issues regarding a procedural due process violation, because under the second qualified-immunity inquiry, defendants' decisions were reasonable, as discussed below.

### b. Reasonableness

As an initial matter, plaintiffs do not set forth evidence showing that defendants knew there was not an emergency, nor that they acted with "reckless disregard" for whether there was an emergency. See *Sinaloa Lake,* 882 F.2d at 1406; see also *Armendariz v. Penman,* 31 F.3d 860, 870 (9th Cir.1994) (holding plaintiffs stated a claim not subject to qualified immunity where they alleged defendants summarily deprived plaintiffs of property rights without a hearing and despite their *knowledge* that no emergency actually existed, as it "would not have been reasonable for [defendants] to claim there was an emergency when they knew that there was no emergency"), *vacated in part on other grounds by* 75 F.3d 1311. Although BOLI eventually dismissed the proceedings against Lumbreras and Fremont, there is no indication in the record that defendants knew at the time BOLI issued the June orders that Lumbreras was *not* using untrained firefighters and thus that there were no circumstances justifying quick action. Indeed BOLI case presenter McSwain testified that he based his emergency-order recommendation on discrepancies in Fremont and agency records.

Given the lack of evidence showing any subjective awareness of the inaccuracy of the basis upon which the summary orders rested, the issue is entirely objective: whether a reasonable state official "could have believed" that his or her conduct was lawful in light of the situation confronted by BOLI. See *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151; see also *Shoshone–Bannock*, 42 F.3d at 1285 (recognizing an official is entitled to qualified immunity when "a reasonable official could have believed that the conduct at issue was lawful").

Plaintiffs do not dispute that the relevant records were such that it was reasonable for one reviewing the records to conclude that Lumbreras had hired untrained firefighters. For example, Fremont's payroll records showed it had paid certain employees for fighting wildfires who were not listed in Fremont's firefighter-training or pertinent agency records. In fact, case presenter McSwain and BOLI administrator Hammond—both non-parties to this lawsuit—concluded that the records showed that Lumbreras had used untrained firefighters. These records corroborated allegations made by third parties with no alleged personal stake in the outcome of the administrative proceedings against Fremont. Plaintiffs also do not dispute McSwain's conclusion that using untrained firefighters presents a serious danger to the general public and the workers themselves.

Plaintiffs make much of the fact that Avila, one of the parties who allegedly believed Fremont was using untrained firefighters, refused to speak directly with BOLI personnel about the allegations. But he also refused to deny the allegations. Thus, contrary to plaintiffs' suggestion otherwise, BOLI personnel could have reasonably believed that Avila in fact had observed Fremont's alleged improper conduct. In addition, although BOLI acted at the peak of harvesting season, the record also shows that it was at or near the peak of the wildfire season.

The court further finds that the fact BOLI failed to give plaintiffs notice and an opportunity to object does not prevent the application of qualified immunity. Although BOLI regulations make such notice and opportunity the usual rule, the regulations also state that BOLI may avoid the rule when "the danger to the public health or safety is so imminent that opportunity for the licensee to object . . . is not practicable *as determined by [BOLI]*." OAR 839–015–0525 (emphasis added). Thus, while clarifying that notice and opportunity generally should be given, the regulations expressly give BOLI wide discretion in determining whether notice and an opportunity to object are appropriate. Especially given that Fremont had firefighters in the field and it was wildfire season, a reasonable official could have reached the same conclusion as that reached by BOLI personnel in this case.

Plaintiffs' position that the orders could have distinguished between farm and forest work does not preclude immunity. Plaintiffs nowhere cite any authority which required BOLI to make any distinction. It may be correct that the regulations appear to give BOLI discretion in deciding whether a contractor may act as both a farm and forest contractor or only as a farm contractor. See OAR 839–015–0320(2) (providing license may indicate whether licensee is "authorized to act as a farm labor contractor *or* whether the licensee is authorized to act as both a farm and forest contractor" (emphasis added)). At the same time, however, the BOLI emergency regulation speaks in terms of refusing to renew a "license." See OAR 839–015–0525; see also ORS 183.430(2) (providing that "where the agency finds a serious danger" an agency "may suspend or refuse to renew a *license* without hearing" (em-

phasis added)). It is undisputed that Fremont's authority to act as a farm and forest contractor was set forth in a single license. It also is undisputed that at all relevant times BOLI believed it could only suspend the entire license, not just a part of it. While the better course might have been to apply the June 12 emergency order only to Fremont's authority to act as a forest contractor, a reasonable BOLI official reviewing the applicable statutes and regulations "could have believed" that the approach in this case was lawful. In sum plaintiffs do not show that clearly established law was such that defendants must have known that failing to carve the license into two categories would be unconstitutional.

Plaintiffs additionally do not cite clearly established law making it unlawful to include numerous alleged violations in an emergency suspension order (which by themselves may not support emergency action). As the June 12 order made clear, it essentially was only the beginning point for an integrated proceeding eventually involving a full contested hearing, at which the licensees would have had the opportunity to contest all the charges against them. Indeed defendants point out that many of the June 12 order's additional alleged violations related to Fremont's discrepant records regarding firefighters. Under the circumstances BOLI faced, especially in light of the opportunity for a full post-deprivation hearing, the court finds that a reasonable official could have believed that the order's presenting all alleged violations in a single order was lawful. Cf., e.g., *Ewing*, 339 U.S. at 596, 70 S.Ct. 870 (concluding summary deprivation taken in the name of public health was permissible given the opportunity for post-deprivation process, even though the articles at issue did not present imminent public-health risks).

In any event, plaintiffs knew that the core allegation giving rise to public-safety concerns was Fremont's alleged use of untrained firefighters. See, e.g., Plaintiffs' Concise Statement of Facts ¶ 44 ("The principal issue in the case against Mr. Lumbreras was allowing untrained firefighters to fight fires."). The record shows that at least as early as April 2002 (about two months before the June 12 order) BOLI informed Lumbreras's attorney of its investigation into whether Lumbreras had been using untrained firefighters. Thus the record shows that the June 12 order was not the first time the government informed Lumbreras of the core charge justifying immediate action.

In sum the court concludes that a reasonable officer could have believed that the issuance of a summary order was constitutional under the circumstances defendants faced. Defendants acted under substantial authority holding that officials have much discretion in making summary deprivations when the officials perceive dangers to the public. See, e.g., *Soranno's Gasco Inc. v. Morgan*, 874 F.2d 1310, 1318 (9th Cir.1989) ("It is well-settled that protection of the public interest can justify an immediate seizure of property without a hearing."). It is not relevant that BOLI ultimately may have been proven wrong; immunity leaves "ample room for mistaken judgments" and does not allow a court to second-guess officials' actions through the lens of hindsight. *Malley*, 475 U.S. at 343, 106 S.Ct. 1092.

### 2. Right to an Unbiased Tribunal

Plaintiffs also argue that defendants violated their constitutional rights by failing to provide impartial decision-makers.

The Ninth Circuit has recognized that a plaintiff may base a Section 1983 claim on the government's infringement of a citizen's "right to an unbiased

**1210**

tribunal." *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir.1995). The court appears to treat this theory as a sub-category of procedural due process, see *id.;* in doing so, the court relied on the following language from the Supreme Court:

> "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome."

*Id.* (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)). Although the Ninth Circuit has recognized that due-process claims based on bias may be viable, "a plaintiff must 'overcome a presumption of honesty and integrity' on the part of decision-makers." *Id.* (quoting *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)). The plaintiff must at least prove that the decision-makers " 'prejudged, or reasonably appears to have prejudged, an issue.' " *Id.* (quoting *Kenneally v. Lungren*, 967 F.2d 329, 333 (9th Cir.1992)).

 Plaintiffs argue that defendants were actually biased against Lumbreras and Fremont. Plaintiffs' claim of personal animosity essentially is based on the following evidence: (1) the issuance of the June 12 order during the short harvesting season, (2) Cunningham's negative statements about Lumbreras including her repetition of rumors, and (3) irregularities in the issuance of the June 12 order—specifi-

cally, BOLI's failure to state expressly that there was a public-safety risk.

None of plaintiffs' proffered evidence is sufficient to overcome the presumption of honesty and integrity on the part of BOLI officials. First, the fact BOLI issued the June orders during harvesting season does not give rise to a reasonable inference of bias. Wildfire season also was peaking at that time. Thus it makes sense that BOLI would have issued the orders when it did, to prevent the use of untrained firefighters.

Additionally Cunningham's negative statements do not show *unconstitutional* bias. For example the balance of the alleged statements merely reflect her judgments regarding Lumbreras's credibility. Agency decision-makers inherently must make credibility judgments during the course of their duties. Cunningham, for example, had to judge Lumbreras's credibility against allegations made by third parties regarding Lumbreras's use of untrained firefighters. Her determination that Lumbreras was not easily believed could reasonably have been based on Lumbreras's prior, repeated violations of Oregon labor law, including his failure to pay workers what he had promised.

Nor does the June 12 order's failure to state expressly that BOLI issued the order to protect public safety create a reasonable inference of bias. At most defendants have shown an administrative oversight. In fact, when Lumbreras's attorney brought the issue to Hammond's attention, BOLI withdrew the order.[5]

---

5. The primary case upon which plaintiffs rely serves to underscore the inadequacy of plaintiffs' evidence of bias. See *Stivers*, 71 F.3d at 741–46. In *Stivers*, the court allowed an unconstitutional-bias claim to go forward where the primary agency decision-maker had a pecuniary interest in the proceedings. In addition, there was detailed evidence showing that

the agency treated Stivers much differently from numerous other licensees; the defendants, in fact, entirely disregarded the agency's in-house counsel's recommendation to grant Stivers a license. In the case at bar, plaintiffs' evidence of bias is a far cry from that presented in *Stivers*.

In any event, for a more fundamental reason, plaintiffs cannot show that defendants' conduct somehow caused biased decision-making: McSwain, a non-party, is the one who made the ultimate recommendation to refuse to renew Fremont's license. As a result of that recommendation, Hammond, another non-party, made the ultimate decision and issued the June 12 order. McSwain testified that he did not in any way consider Cunningham's opinions about Lumbreras in making his recommendation. Instead McSwain relied on the available records and third-party allegations. There is nothing in the record to rebut McSwain's testimony; for instance, contrary to plaintiffs' contention otherwise, the record does not suggest that Cunningham so dominated the proceedings that McSwain must have been influenced by Cunningham's opinions about Lumbreras. Thus, even assuming that Cunningham's statements might have a tendency to show improper bias on her part, it is undisputed that the ultimate decision-makers acted free of the influence of Cunningham's opinions. Cf. *Stivers,* 71 F.3d at 741 (providing that plaintiff must show that the *"adjudicator ... prejudged"* issues (emphasis added)). Accordingly the court grants summary judgment on this claim.

### 3. Substantive Due Process

Plaintiffs also argue that defendants have violated their substantive due-process rights. For the reasons briefly discussed below, the court finds that plaintiffs have failed to show there are any material issues regarding such a constitutional violation.

■■■■ It is well established that the Due Process Clause also has a "substantive component" which protects individuals against " 'certain government actions regardless of the fairness of the procedures used to implement them.' " *Harker*

*Heights,* 503 U.S. at 125, 112 S.Ct. 1061 (quoting *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). The concept of substantive due process is meant to protect citizens from "the arbitrary exercise of the powers of government." *Daniels,* 474 U.S. at 333, 106 S.Ct. 677 (citation omitted); see also *County of Sacramento v. Lewis,* 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Establishing a substantive due process violation is difficult. There is a "presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces." *Harker Heights,* 503 U.S. at 128, 112 S.Ct. 1061. Substantive due process is not "a guarantee against incorrect or ill-advised" decisions. *Id.* (citation omitted). In fact, "the use of substantive due process to extend constitutional protection to economic and property rights has been largely discredited." *Armendariz,* 75 F.3d at 1318–19.

The Supreme Court a few years ago reiterated the restrictive standard governing claims brought against executive officials for alleged harm resulting from a particular event or decision:

Our cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be "arbitrary in the constitutional sense." ... To this end, for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience.

*Lewis,* 523 U.S. at 846, 118 S.Ct. 1708 (quoting *Harker Heights,* 503 U.S. at 129, 112 S.Ct. 1061). The Court recognized, however, that "the measure of what is conscience shocking is no calibrated yard stick" and thus what conduct or degree of culpability meets that standard will vary

with the circumstances. *Id.* at 847–49, 118 S.Ct. 1708. At the very least, however, a plaintiff must show that "the government's action was 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.'" *Sinaloa Lake,* 882 F.2d at 1407 (quoting *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926)).[6]

Plaintiffs' substantive due process argument rests on the same evidence presented in support of the "biased tribunal" claim, discussed *supra.* The court concludes that plaintiffs' evidence fails to overcome the presumption of rational governmental decision-making, see *Harker Heights,* 503 U.S. at 128, 112 S.Ct. 1061. Plaintiffs do not submit sufficient evidence showing that defendants acted out of personal animosity and without regard to the presented evidence, which included Fremont's own discrepant records and third-party allegations. Most important, the court again observes that it is undisputed that the final decision-makers in this case acted free of any bias harbored by defendants.

On this record, the court simply cannot find any government action which was so egregious as to shock the conscience. Instead BOLI officials acted to protect "the public health, safety, morals, or general welfare." *Sinaloa Lake,* 882 F.2d at 1407.

#### 4. Equal Protection

Finally, plaintiffs also assert Section 1983 claims based on alleged violations of the Equal Protection Clause. As discussed below, plaintiffs have not shown any material issues regarding this constitutional theory.

 State action which "does not implicate a fundamental right or a suspect classification passes constitutional muster under the equal protection clause so long as it bears a rational relation to a legitimate state interest." *Armendariz,* 75 F.3d at 1326. Although this standard is deferential to governmental action, "'the rational relation test will not sustain conduct by state officials that is malicious, irrational or plainly arbitrary.'" *Id.* (quoting *Lockary v. Kayfetz,* 917 F.2d 1150, 1155 (9th Cir.1990)).

 The Supreme Court has recognized the viability of equal-protection claims based on a "class of one" theory. *Village of Willowbrook v. Olech,* 528 U.S. 562, 563, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (*per curiam* ). Under a class-of-one theory the plaintiff need not allege any "membership in a class or group." *Id.* To state a claim under this theory, the plaintiff must show he "has been intentionally treated differently from others similarly situated and that there is no rational basis

---

**6.** Plaintiffs rely on a Third Circuit case for the proposition that they need only show that defendants were "'motivated by a lack of impartiality toward'" co-licensees Lumbreras and Fremont. See Plaintiffs' Memorandum in Opposition at 15 (quoting *Bello v. Walker,* 840 F.2d 1124, 1129 (3d Cir.1988)). The Third Circuit, however, has since disapproved of the "improper motive" test applied in *Bello v. Walker.* See *United Artists Theatre Circuit, Inc. v. Township of Warrington,* 316 F.3d 392, 400–01 (3d Cir.2003). In overruling *Bello,* the Third Circuit explained:

[The *Bello* line of cases] cannot be reconciled with [the Supreme Court's] explana-

tion of substantive due process analysis. Instead of demanding conscience-shocking conduct, the *Bello* line of cases endorses a much less demanding "improper motive" test for governmental behavior. Although the District Court opined that there are "few differences between shocks the conscience standard and the improper motive standard, we must respectfully disagree. The "shocks the conscience" standard encompasses only the most egregious official conduct. In ordinary parlance, the term "improper" sweeps much more broadly...."

*Id.* (citations omitted).

for the difference in treatment." *Id.* Thus, to prevail, "the plaintiff must demonstrate that the government is treating unequally those individuals who are prima facie identical in all relevant respects, and that the cause of the differential treatment is a totally illegitimate animus toward the plaintiff by the defendant." *Albiero v. City of Kankakee,* 246 F.3d 927, 932 (7th Cir.2001) (citation omitted). "Ill will must be the sole cause of the complained-of action." *Id.*

In the case at bar, plaintiffs do not allege they were part of any class. Instead their equal-protection claims are based on a "class of one" theory. But they have not made the threshold showing they were treated differently from others "similarly situated." They rely on BOLI's enforcement action against Mr. Larry Rue whom BOLI fined for using fraudulent firefighter-training cards. Plaintiffs argue that because BOLI only fined Rue for firefighter-related violations while the agency refused to renew Fremont's license, the licensees were similarly situated. This is not sufficient to show that Rue was "similarly situated." For example, plaintiffs do not explain whether Rue had allegedly untrained firefighters in the field at the time BOLI acted, as Lumbreras did when BOLI acted in Lumbreras's case. Defendants, in fact, submitted an affidavit from Rue's BOLI case presenter averring that, before deciding not to suspend Rue's license, BOLI obtained satisfactory verification that Rue's current firefighters had been trained. See Aff. Burgess ¶ 5. Thus, unlike McSwain in Lumbreras's case, Rue's case presenter was not "concerned that allowing Mr. Rue to operate as a contractor presented any immediate and serious danger to the safety of his employees or the public." *Id.* It also is notable that Mr. Rue had a materially different history from Lumbreras regarding labor-law compliance. Rue's only prior violation

involved minor "paperwork violations." *Id.*

Furthermore, as discussed *supra,* given the evidence before BOLI when it issued the June orders, the court cannot say that issuing the orders was "irrational or plainly arbitrary." See *Armendariz,* 75 F.3d at 1326. Finally plaintiffs cannot possibly show that any ill will on the part of the defendants "was the sole cause" of the June orders. *Albiero,* 246 F.3d at 932. There is no evidence suggesting Hammond and McSwain based their decisions on any ill will fostered by defendants.

Accordingly the court concludes that defendants are entitled to qualified immunity as to all of plaintiffs' Section 1983 claims. Only plaintiffs' state law theory remains standing.

## III. INTERFERENCE WITH ECONOMIC RELATIONSHIP

Plaintiffs assert one pendent state law claim for interference with economic relationship. Lumbreras and Fremont allege that by summarily suspending Fremont's license BOLI interfered with their strawberry-harvesting contract with Vanderhave and Green Villa.

The court concludes that plaintiffs' state law claims are barred by the Eleventh Amendment. This conclusion is compelled by the requirements of the Oregon Tort Claims Act. That Act provides that the "sole cause of action for any tort of officers, employees or agents of a public body acting within the scope of their employment or duties and eligible for representation and indemnification under ORS 30.285 or 30.287 shall be an action against the public body only." ORS 30.265. It is undisputed that defendants are state officials and eligible for legal representation and indemnification within the scope of the relevant statutory provisions. Thus defendants request that the court substitute the

state as the party being sued for interference of economic relationship.

■ To determine whether officials were acting "within the scope of their employment or duties" for purposes of the Tort Claims Act, a court should consider the following factors: (a) whether the conduct was of the kind the defendant was hired to perform, (b) whether the conduct occurred within an authorized time and space, and (c) whether the defendant was motivated at least in part by a purpose to serve the employer. See *Center for Legal Studies, Inc. v. Lindley*, 64 F.Supp.2d 970, 974 (D.Or.1999) (citing *Brungardt v. Barton*, 69 Or.App. 440, 443, 685 P.2d 1021 (1984)).

■ In the case at bar, the conduct about which plaintiffs complain plainly was the type of conduct defendants were hired to perform. The claims are based on defendants' alleged conduct associated with investigating and prosecuting a license renewal. There is no indication defendants acted outside any "authorized time or space." Finally, largely for the reasons discussed *supra*, the more reasonable inference to be drawn from the record is that defendants' conduct was motivated at least in part by a purpose to serve BOLI and the state. Indeed, as discussed, Cunningham's various negative statements about Lumbreras—plaintiffs' primary evidence regarding defendants' motivation— were essentially judgments relating to credibility and the merits of the case or statements made in the course of discussing the case. Thus her statements were within the scope of her "employment or duties." See ORS 30.265; see, e.g., *Center for Legal Studies*, 64 F.Supp.2d at 975–76 (substituting state for named state agency official, even though plaintiffs alleged official "was motivated by his personal agenda," because sufficient evidentiary support for that allegation could not "be inferred from the record").

Based on a consideration of the relevant factors, the court agrees that the state is the proper party to sue for the alleged intentional interference. As a result, the state-law claims are barred by the Eleventh Amendment. See *Dittman v. California*, 191 F.3d 1020, 1025–26 (9th Cir. 1999) (observing claims against a state or "agencies of the state" are immune from private damages actions in federal court).

## IV. CONCLUSION

For the foregoing reasons the court grants in full defendants' motion to dismiss and for summary judgment. (Doc. # 28). In summary, plaintiffs Vanderhave and Green Villa lack standing to bring their constitutional claims. As to defendant Roberts, plaintiffs have not shown sufficient affirmative involvement on his part or causal connection between his conduct and the alleged constitutional deprivations. The court further finds that defendants, in any event, are qualifiedly immune from liability for all of plaintiffs' claims.

IT IS SO ORDERED.